CASE 60—PETITION ORDINARY—DECEMBER 23.

# Munford, &c., vs. Taylor.

APPEAL FROM HARDIN CIRCUIT COURT.

1. Larceny committed by a slave amounts to a misdemeanor only.—Here the slave had taken in the night time from the mail stage a trunk containing clothing and other articles of value, belonging to one of the passengers. He had also stolen a horse.

2. A peace officer and a private person, without a warrant, arrested a slave who had committed a misdemeanor in another county, and not in their presence, and instead of

Munford, &c., vs. Taylor.

carrying the slave before a magistrate for an examination, forcibly took him from the possession of his owner, and committed him to the county jail, from which he escaped and was thereby lost to his owner. *Held*—That the persons who arrested the slave and the jailer who received him into custody are liable to the owner for his value.

3. Where there has been a wrongful assumption of dominion or control by one party over the slave of another, and in violation of the rights of the owner, the wrong doer will be held responsible for the consequences which ensue during the continuance of the wrongful act, however extraordinary and unexpected those consequences may be. (12 *B. Mon.*, 410.)

4. The principle, *supra*, has been extended even further by the adjudications of this court; and it has been held that he who wrongfully detains the property of another, although he may have acquired the possession rightfully, does it at his own peril, and will be responsible to the proprietor, though the property should be destroyed by accident or taken from him by violence. Thus it is held that all bailees are responsible for losses by casualty or violence.after their refusal 'to return the things bailed on a lawful demand. (4 *Bibb*, 270; 6 *Mon.*, 113; 9 *B. Mon.*, 106; *Jones on Bailments*, 94.)

T. N. & D. W. LINDSEY, for appellants, cited *Criminal Code*, *sec.* 33, *sub-div.* 2; *Hawk. P. C.*, *chapter* 13, *sec.* 11; *Doug.*, 359; 1 *Roll Abr.*, *D.*, 559; *Moore*, 408; 12 *B. Mon.*, 416; 16 *Ib.*, 200, 396; 17 *Ib.*, 156; *Rev. Stat.*, 639, *sec.* 5; *Wharton*, 1697, 1700; 8 *Smedes & Marshall*, 401; 17 *B. Mon.*, 692; 5 *Mon.*, 552; 7 *Mon.*, 649; 8 *Dana*, 158; 1 *B. Mon.*, 292; 10 *B. Mon.*, 28.

JOHN L. HELM and J. H. JEWETT, on same side.

HARLAN and WINTERSMITH, for appellee, cited *Rev. Stat.*, 640, *secs.* 10, 13; *Crim. Code*, *secs.* 32, 33, 34, 43; 8 *B. Mon.*, 282; *Crim. Code*, *secs.* 2, 3, 4; *Rev. Stat.*, 640, *secs.* 10, 12; *Wharton's Crim. Law*, 629; 3 *Wash. C. C.*, 209; 4 *Binney*, 379; 2 *East Pleas of the Crown*, 708; *Archbold*, *p.* 361; *Crim. Code*, *secs.* 23 to 31; *Ib.*, *secs.* 46, 49, 59, 60; 7 *Peters*, 141; 12 *B. Mon.*, 410; *Story on Bailments*, *secs.* 413, 409, 396, 254, 241, 233, 232; 8 *Coke Rep.*, 290; *Smith's Leading Cases*, 62; 10 *Johnson*, 255; 1 *Hilliard on Torts*, *page* 114; *Amer. Law Reg.*, *Sept.*, 1859, *page* 675; *Rev. Stat.*, *title Execution*, *article* 7.

JUDGE DUVALL DELIVERED THE OPINION OF THE COURT:

Taylor brought this action against Munford, Larue, and Arthur, to recover for the loss of a slave.

The plaintiff, in his petition, alleged that he was the owner and was in possession of a negro man of the value of fifteen hundred dollars, and that the defendants, Munford and Larue, forcibly took said slave from the possession of the plaintiff, and

delivered him to the defendant, Arthur, who locked him up in jail against the will and consent of the plaintiff; that he demanded the slave of the defendants, they knowing him to be the owner, but they refused to give up the slave, and kept him.

The defendants answered separately.

Larue alleged that he was marshal of Elizabethtown, and had been informed that the slave of the plaintiff had committed a felony by taking from the United States mail stage, within the State of Kentucky, a trunk containing valuable clothes, &c. "He avers that said negro did in fact steal said trunk, and convert the clothes within, or a part of them, to his own use." "And said negro had committed and was guilty of another felony, to-wit: he stole and carried away the horse of ———— Amos." That the slave had escaped from the service of his master, and had been committed to jail, and the plaintiff, claiming to be the owner, obtained possession of the slave, and was in the act of carrying him out of the jurisdiction of the commonwealth, and it became necessary to make quick pursuit to capture him with a view to bring him to justice; and the defendant, in his capacity of town marshal, did take the slave into custody to prevent his escape, and did lodge him in jail with a view to secure and bring him to justice.

Munford stated in his answer that he was at the time the agent of the proprietors of the mail stage running between Louisville and Nashville, from which stage a robbery had been committed "by taking and carrying away therefrom, with the felonious intent of *stealing*, one trunk, containing valuable clothes and books;" that the slave described in the petition did commit said *felony*, and had stolen a horse belonging to Amos, and being so guilty of two felonies, the plaintiff claimed the slave as a fugitive from labor, and was proceeding to carry him beyond the jurisdiction of the State when the defendant was summoned by the marshal to aid in arresting the slave, and the defendant did so aid, in virtue of said summons.

Arthur alleged in his defense that he was, at the time, the jailer of Hardin county; that the slave had committed a felony by stealing a trunk, and had also stolen a horse; that the plaintiff, claiming the slave, had obtained possession of him as a

fugitive from labor, and was in the act of removing him from the commonwealth; that the marshal arrested the slave and brought him to the jail, requesting the defendant to confine him, which the defendant did, believing such confinement necessary to the safe-keeping of the slave; that the slave thus committed afterwards broke jail and escaped to parts unknown.

To each of these answers the plaintiff demurred; but the court overruled the demurrer, and upon a trial of the issues there was a verdict and judgment for the plaintiff against the defendants jointly, for $1,135. From this judgment the defendants have appealed.

There was no contrariety in the evidence relating to the material facts of the case, which are substantially these:

In the spring of the year 1857, the slave in question had escaped from the possession of his owner, Taylor, the appellee, who lived in the State of Tennessee. The slave was arrested in Elizabethtown as a runaway, and was committed to the jail of Hardin county, where he remained until about the 1st of June, (a period of forty-seven days,) when Taylor appeared, claimed and proved that the negro was his property, and having paid the expenses incident to his arrest, had taken him into his buggy, and was about starting with him home, when the appellants, Munford and Larue, came up, and arrested the slave upon a charge of having stolen a trunk from the mail stage in Barren county, and a horse from some person in Hart county. Taylor then proposed that he would take the slave to Hart county for trial, or that Munford and Larue might do so; but they declined. Munford proposed that if Taylor would pay $60, the value of the trunk, so as to indemnify the owners of the stage from which it had been taken, Munford being the agent of the owners, he (Taylor) might take the slave. This the latter declined, upon the ground that two other negroes were engaged in the offense, and it would not, therefore, be right that he should pay the whole of the required indemnity, and that even were he to do this, his boy might be arrested on his way home through Hart. Munford suggested that he could take him home by a different route; to which Taylor replied, that "he had never run from the laws of his country, and would

not now." Larue and Munford then took the slave from Taylor, against his will, and delivered him to the jailer, and on the night of the same day the slave made his escape from the jail. A magistrate kept his office within twenty feet of the place where the slave was taken from Taylor by Larue and Munford, who had to pass by the office in going to the jail—the magistrate being in his office at the time of the arrest.

It was proved that the slave had taken from the mail stage a trunk containing clothing and other articles of value, belonging to one of the passengers. The trunk was taken in the night time, and the fragments of it were found near Ritter's, in Barren county. Two other negroes were also engaged with Taylor's slave in stealing the trunk. It was also proved that he stole a horse in Hart county.

The value of the slave was variously estimated at prices ranging from $1,000 to $1,300.

The defendants rely upon two principal grounds for reversal :

1. That they did not exceed their authority, nor commit a trespass or other violation of the law, in arresting or imprisoning the slave.

2. That there was no such connection between the acts done by them, and the subsequent escape and loss of the slave, as renders them liable to the owner for his value.

1. In examining the first point, the inquiry that presents itself in the outset is, for what description of offense was the slave arrested and committed? Was he charged with a felony, or with a misdemeanor only ?

The answers of the appellants, as well as the facts proved on the trial, furnish a satisfactory and conclusive response to this inquiry. Each of the appellants sets forth with sufficient minuteness and certainty of description the offense which they severally allege had been committed by the slave. Larue avers " that said negro did in fact *steal* said trunk and convert the clothes within," &c., " and said negro had committed and was guilty of *another felony*, to-wit: he *stole* and carried away the horse of Amos." Munford states that the negro had committed a *robbery* by taking and carrying away from the stage,

"with the felonious intent of *stealing*, one trunk," &c., and had *stolen* a horse from Amos, and was thus guilty of two *felonies*. Arthur describes the offenses with which the slave was charged in the same terms substantially.

These answers were evidently framed upon the idea that stealing or larceny, although committed by a slave, amounted to a felony, and that there was no distinction between robbery and larceny, either in respect to the punishment or to the intrinsic nature of the two offenses.

But by the act of 1802, as well as by the Revised Statutes, if a slave commit a larceny he is punishable with stripes not exceeding thirty-nine. And the 3d section of the act of 1806, (2 *Stat. Law*, 1286,) declares that where a slave shall be charged with an offense punishable with stripes only, it shall be deemed a *misdemeanor*.

The Criminal Code also defines a felony to be "an offense of which the punishment is death or confinement in the penitentiary;" and declares that all other offenses are misdemeanors. (*Sections* 3 *and* 4.)

It is conceded by counsel that to constitute robbery, something more is necessary than the mere taking of property with a felonious intent. No fact is alleged in the pleadings or was proved on the trial, tending to show that the slave had committed a robbery, either in the taking of the trunk or the horse.

The appellee's negro, then, having been charged with a misdemeanor only, and being in the lawful possession of his owner, the question arises, what was the duty of the appellants under the circumstances, and what was the extent of their authority, either as peace officers or as private citizens, in arresting and bringing him to justice?

The law has very clearly defined and limited the authority of peace officers and of private persons in arresting those charged or suspected of having committed a public offense.

"A peace officer may make an arrest—1. In obedience to a warrant of arrest delivered to him. 2. Without a warrant where a public offense is committed in his presence, or where he has reasonable grounds for believing that the person arrested has committed a felony."

" A private person may make an arrest where he has reasonable grounds for believing that the person arrested has committed a felony." (*Crim. Code, secs.* 33, 34.)

Neither of the appellants had obtained a warrant of arrest, and neither of them had any authority to make the arrest without warrant, because the offense had not been committed in their presence, and there were no reasonable grounds for believing that the negro had committed an offense punishable otherwise than with stripes. They set up no such defense in their answers. Their counsel insist, however, that they had probable grounds for believing a felony had been committed, because they were not bound to know that the negro was a slave. But it is distinctly alleged in the petition that he was a slave, and that the appellants knew that the appellee was the owner; and these facts are not controverted in either of the answers. It follows, therefore, that the arrest was made without legal authority, and in violation of the rights of the appellee.

But the subsequent conduct of the appellants was still more indefensible.

For if it be admitted that they had probable grounds for believing the slave had committed a felony, and that they rightfully made the arrest without a warrant, what then was their plain duty ?

The law provides that in such cases " the defendant shall be forthwith carried before the most convenient magistrate of the county in which the arrest is made, and the grounds on which the arrest was made shall be stated to the magistrate; and if the offense for which the arrest was made is charged to have been committed in a different county from that in which the arrest was made, and the magistrate believes, from the statements made to him on oath that there are sufficient grounds for an examination, he shall, by his written order, commit the defendant to a peace officer, to be conveyed by him before a magistrate of the county in which the offense is charged to have been committed." (*Crim. Code, sec.* 43.)

There was, according to the proof, a magistrate in his office at the time of the arrest, and within twenty feet of the place

where the arrest was made. Why was not the negro taken forthwith before this magistrate, to be dealt with according to law? What excuse or justification is to be found in the attendant facts and circumstances, for the act of the appellants in committing the negro to jail? None whatever.

The appellee had manifested no disposition to evade the law, or to shield the slave from punishment. So far from this, he proposed, as already stated, that he would himself take the slave to the proper county for trial, or that Munford and Larue might do so.

But, as we have seen, the offense charged was a misdemeanor only, and in such cases, the section of the Code just quoted provides, that the " defendant may give bail before the magistrate for appearing before the judge of the county court of the county in which the offense was committed, on a day to be named in the bail bond, or for appearing before the court having jurisdiction to try the offense, on a day to be fixed by the magistrate." Even where a slave is charged with felony, the master or owner may bail such slave in those cases in which free persons are bailable according to the laws regulating bail in criminal cases. (*Rev. Statutes, sec.* 19, *p.* 377, *Stanton's edition.*)

Under these statutes the owner of the slave had a clear legal right to bail him, and by that means to have retained the possession of him—a right of which it is to be presumed he would undoubtedly have availed himself, if the appellants had afforded him the opportunity, by complying with the requirements of the law. They, however, in utter disregard of his rights and of their own duties, instead of carrying the slave before the magistrate for an examination as to the offenses of which he was accused, forcibly, and without authority, took him from the possession of his owner, and committed him to the county jail, from which he escaped, and was thereby lost to his owner. Were the appellants, upon these facts, properly held liable to the appellee for the value of this slave?

2. This brings us to a consideration of the second ground relied on for reversal—that the escape and loss of the slave were not the natural and direct consequence of the wrongful

acts of the appellants, and that therefore they are not liable for his value.

The facts of this case show very conclusively that it does not belong to that class of cases in which it becomes important to inquire into the connection subsisting between the wrongful act and the injury resulting from it. It will be found that the authorities upon this subject, without any exception, recognize the distinction between cases where the damage ensues whilst the injurious act continues in operation, and those where the damage occurs after the act has ceased. In the latter class of cases, it is held necessary, to entitle the plaintiff to recover, that he should show the damage to have been the proximate and direct consequence of the wrongful act of the defendant. This rule does not apply to the former class, as was expressly decided by this court in the case cited by the counsel for the appellants, of *King vs. Shanks*, (12 *B. Mon*, 410,) in which various adjudged cases are referred to which establish the doctrine, that where there has been a wrongful assumption of dominion or control, by one party, over the slave of another, and in violation of the rights of the owner, the wrong doer will be held responsible for the consequences which ensue during the continuance of the wrongful act, however extraordinary and unexpected those consequences may be.

In the case before us, the appellants wrongfully took possession of the slave, and wrongfully detained him. His escape, and the consequent damage sustained by his owner, occurred during the continuance of their unauthorized assumption of dominion over him, and was the immediate result of their wrongful act, and, upon the principles stated, they were unquestionably liable to the owner for his value.

But the adjudications of this court have extended the principle even further. In the case of *Carrell vs. Early*, (4 *Bibb*, 270,) it was held that he who *wrongfully detains* the property of another, although he may have acquired the possession rightfully, " does it at his own peril, and will be responsible to the proprietor, though the property should be destroyed by accident or taken from him by violence. Thus it is held that all bailees are responsible for losses by *casualty* or *violence* after their

refusal to return the things bailed on a lawful demand." (*Jones on Bailments*, 94.)

The same rule was recognized and acted on in the subsequent cases of *Gentry vs. Barnett*, (6 *Mon.*, 113,) and *Scott vs. Hughes*, (9 *B. Mon.*, 106.)

It results from the view which has been taken of this case, that the facts stated in the answers of the appellants did not present a valid defense to the action, and that the court below did not err to their prejudice in the instructions given to the jury, nor in refusing those asked by them.

Whether the appellants, in arresting and imprisoning this slave, were actuated by the motives ascribed to them by their counsel, or by other considerations less patriotic, is a question in regard to which we have not felt called on to express an opinion. Our inquiries have been confined to the legal quality and consequences of their acts.

The judgment is affirmed.