ATTORNEY GENERAL *vs.* HENRY B. WILLIAMS & others.

Suffolk.   January 25, 26, 1899. — October 30, 1899.

Present: HOLMES, C. J., KNOWLTON, MORTON, LATHROP, BARKER, HAMMOND, & LORING, JJ.

*Limitation of Height of Buildings in Boston — Constitutional Law — Approval by Park Commissioners of Ornamentation — Remedy — Statute.*

The St. 1898, c. 452, entitled " An Act relative to the height of buildings on and near Copley Square in the city of Boston," is constitutional.

A rectangular building, having walls ninety-six feet in height to the roof, was erected in the locality in Boston named in St. 1898, c. 452, limiting the height of buildings to be erected there to ninety feet, exclusive of such sculptured ornaments as the board of park commissioners might approve.   The ceilings of the rooms in the upper story were a few inches above a horizontal line of the height of ninety feet.   Above the rooms there was an open air space extending to the roof, a distance of about four feet, measured on the inside of the outer walls of the building.   These walls were of brick, and on two sides fronting on streets there was an ornamental facing of terra cotta partly in relief and extending from a line ninety feet in height upward to the roof, constituting the architrave, frieze, and cornice of the building.   On the other two sides of the building the walls of a corresponding height were of plain brick.   *Held,* that a vote of the park commissioners, approving " the sculptured ornaments erected on the building . . . above the height of ninety feet," did not relieve the building from the prohibition of the statute.

An information in equity by the Attorney General is the proper form of proceeding to prevent a violation of St. 1898, c. 452, relating to the height of buildings on and near Copley Square in Boston; and that statute did not create rights enforceable only under St. 1894, c. 257, giving jurisdiction in equity, on the application of the city, to prevent violations of provisions " of the acts relating to the erection or alteration of buildings " therein.

INFORMATION IN EQUITY, filed September 11, 1898, by the Attorney General, at the relation of the Museum of Fine Arts, to restrain the erection and maintenance of a building on Copley Square in Boston above the height of ninety feet prescribed by St. 1898, c. 452, entitled " An Act relative to the height of buildings on and near  Copley Square in the city of  Boston."   A demurrer and pleas were filed by the defendants.   Hearing before *Knowlton,* J., who reported the case for the consideration of the full court.   The facts appear in the opinion.

The case was argued at the bar in January, 1899, and afterwards was submitted on briefs to all the justices.

*S. J. Elder & E. A. Whitman*, for the plaintiff.

*A. E. Pillsbury*, for the defendants.

KNOWLTON, J.   This is an information by the Attorney General to prevent the erection and maintenance of that portion of a building on Copley Square in the city of Boston which is above the limit of height prescribed by St. 1898, c. 452. Section 1 of this statute is as follows : " Any building now being built or hereafter to be built, rebuilt, or altered in the city of Boston upon any land abutting on St. James Avenue between Clarendon Street and Dartmouth Street, or upon land at the corner of Dartmouth Street and Huntington Avenue, now occupied by the Pierce building, so called, or upon land abutting on Dartmouth Street now occupied by the Boston Public Library building, or upon land at the corner of Dartmouth Street and Boylston Street now occupied by the New Old South Church building, may be completed, built, rebuilt, or altered to the height of ninety feet and no more; and upon any land or lands abutting on Boylston Street between Dartmouth Street and Clarendon Street may be completed, built, rebuilt, or altered to the height of one hundred feet and no more ; provided, however, that there may be erected on any such building above the limits hereinbefore prescribed, such steeples, towers, domes, sculptured ornaments, and chimneys as the board of park commissioners of said city may approve." Section 2 repeals St. 1896, c. 313, and St. 1897, c. 379, so far as they limit the height of buildings erected along the line of streets, parkways, or boulevards bordering on public parks.   Section 3 provides for the payment of damages to any person owning or having an interest in an uncompleted building begun before the fourteenth day of January, 1898, which is affected by the act, and section 4 provides for compensation to all persons sustaining damages to their property by reason of the limitation of the height of buildings prescribed by the act.   The case is reported upon the information, demurrer, pleas, and certain facts found at the hearing on the pleas.

The first question raised by the report is whether the statute is constitutional.   The streets mentioned in the statute are adjacent to Copley Square.   On the case as now presented we must assume that Copley Square, in the language of the information, " is an open square and a public park intended for

the use, benefit, and health of the public, and is surrounded by buildings devoted to religious, charitable, and educational purposes, some of which contain books, manuscripts, and works of art of great value, many of which are in their nature irreplaceable." Regulations in regard to the height and mode of construction of buildings in cities are often made by legislative enactments in the exercise of the police power, for the safety, comfort, and convenience of the people and for the benefit of property owners generally. The right to make such regulations is too well established to be questioned. *Watertown* v. *Mayo*, 109 Mass. 315. *Salem* v. *Maynes*, 123 Mass. 372. *Sawyer* v. *Davis*, 136 Mass. 239. See *Talbot* v. *Hudson*, 16 Gray, 417. In view of the kind of buildings erected on the streets about Copley Square and the uses to which some of these buildings are put, it would be hard to say that this statute might not have been passed in the exercise of the police power, as other statutes regulating the erection of buildings in cities are commonly passed. But it differs from most statutes relative to this subject in providing compensation to persons injured in their property by the limitations which it creates. In this respect it conforms to the constitutional requirements for the taking of property by the right of eminent domain. Looking to all its provisions in connection with the place to which they apply, it seems to have been intended as a taking of rights in property for the benefit of the public who use Copley Square. It adds to the public park rights in light and air and in the view over adjacent land above the line to which buildings may be erected. These rights are in the nature of an easement created by the statute and annexed to the park. Ample provision is made for compensation to the owners of the servient estates. In all respects the statute is in accordance with the laws regulating the taking of property by right of eminent domain, if the Legislature properly could determine that the preservation or improvement of the park in this particular was for a public use. The uses which should be deemed public in reference to the right of the Legislature to compel an individual to part with his property for a compensation, and to authorize or direct taxation to pay for it, are being enlarged and extended with the progress of the people in education and refinement. Many things which a cen-

tury ago were luxuries or were altogether unknown, have now become necessaries. It is only within a few years that lands have been taken in this country for public parks. Now the right to take land for this purpose is generally recognized and frequently exercised. *Foster* v. *Park Commissioners*, 133 Mass. 321. *Shoemaker* v. *United States*, 147 U. S. 282. Many statutes have been passed in this Commonwealth allowing taxation for purposes affecting the health, comfort, pleasure, and recreation of the people and thus conducing to their welfare. In *Kingman* v. *Brockton*, 153 Mass. 255, the court said, referring to a statute authorizing the raising of money by taxation for the erection of a memorial hall: " That statute . . . may be vindicated on the same grounds as statutes authorizing the raising of money for monuments, statues, gates or archways, celebrations, the publication of town histories, parks, roads leading to points of fine natural scenery, decorations upon public buildings, or other public ornaments or embellishments, designed merely to promote the general welfare, either by providing for fresh air, or recreation, or by educating the public taste, or by inspiring sentiments of patriotism or of respect for the memory of worthy individuals. The reasonable use of public money for such purposes has been sanctioned by several different statutes, and the constitutional right of the Legislature to pass such statutes rests on sound principles." See also *Higginson* v. *Nahant*, 11 Allen, 530, and *Hubbard* v. *Taunton*, 140 Mass. 467. In *Olmstead* v. *Camp*, 33 Conn. 532, 551, the court, in discussing the line between public and private uses, says : " From the nature of the case there can be no precise line. The power requires a degree of elasticity to be capable of meeting new conditions and improvements and the ever increasing necessities of society. The sole dependence must be on the presumed wisdom of the sovereign authority, supervised, and in cases of gross error or extreme wrong, controlled, by the dispassionate judgment of the courts." The grounds on which public parks are desired are various. They are to be enjoyed by the people who use them. They are expected to minister, not only to the grosser senses, but also to the love of the beautiful in nature in the varied forms which the changing seasons bring. Their value is enhanced by such touches of art as help to produce pleasing and satisfactory effects on the emotional and spiritual side of

our nature. Their influence should be uplifting and, in the highest sense, educational. If wisely planned and properly cared for they promote the mental as well as the physical health of the people. For this reason it has always been deemed proper to expend money in the care and adornment of them to make them beautiful and enjoyable. Their aesthetic effect never has been thought unworthy of careful consideration by those best qualified to appreciate it. It hardly would be contended that the same reasons which justify the taking of land for a public park do not also justify the expenditure of money to make the park attractive and educational to those whose tastes are being formed and whose love of beauty is being cultivated. We have already quoted from the information the language in regard to the surroundings of the square. The counsel on both sides referred in argument to the well known buildings which constitute these surroundings. Trinity Church, the Museum of Fine Arts, the Boston Public Library, the New Old South Church, the Second Church of Boston, and the buildings of the Massachusetts Institute of Technology all face the beholder who stands on Copley Square and looks around him. Some of these buildings are public in the ordinary sense of the word, and some of the corporations which own them have been beneficiaries of the Commonwealth on account of their quasi public character, and the public certainly feels an interest in them. It is argued by the defendants that the Legislature, in passing this statute, was seeking to preserve the architectural symmetry of Copley Square. If this is a fact, and if the statute is merely for the benefit of individual property owners, the purpose does not justify the taking of a right in land against the will of the owner. But if the Legislature, for the benefit of the public, was seeking to promote the beauty and attractiveness of a public park in the capital of the Commonwealth, and to prevent unreasonable encroachments upon the light and air which it had previously received, we cannot say that the law-making power might not determine that this was a matter of such public interest as to call for an expenditure of public money, and to justify the taking of private property. While such a determination should not be made without careful consideration, and while the growing tendency towards an enlargement of the field of public

expenditure should be jealously watched and carefully held in check, a determination of this kind once made by the Legislature cannot be lightly set aside.

It may be contended that if the Legislature could take this right for the use of the public, it could not require the city of Boston to make compensation for it, but should have provided for the payment of damages from the treasury of the Commonwealth. This contention would limit too strictly the power of the Legislature in the distribution of public burdens. Very wide discretion is left with the law-making power in this particular. The Legislature may change the political subdivisions of the Commonwealth by creating, changing, or abolishing particular cities, towns, or counties. It may require any of them to bear such share of the public burdens as it deems just and equitable. This right has been exercised in a great variety of ways. *Kingman, petitioner*, 153 Mass. 566, and cases and statutes there cited. It does not depend upon the clause of the Constitution which authorizes the imposition of taxes, but upon the more general provisions defining the power of the Legislature. While the interest to which this statute looks is public, it is largely local. A very large part of the public who are affected by the statute are citizens of Boston. The valuation of Boston is a large proportion of the valuation of the whole Commonwealth. The Legislature might well put the whole of this public burden upon the city of Boston.

It appears that on October 31, 1898, the board of park commissioners voted " that the sculptured ornaments erected on the building . . . above the height of ninety feet, as shown in the plans thereof submitted to the board and in the building as now erected," be approved. The building is rectangular, and the height of its walls to the roof is ninety-six feet. The ceilings of the rooms in the upper story are a few inches above a horizontal line of the height of ninety feet. Above these rooms there is an open air space extending to the roof, a distance of about four feet, measured on the inside of the outer walls of the building. The walls of the building are of brick, and on the two sides fronting on the streets there is an ornamental facing of terra cotta partly in relief and extending from a line ninety feet in height upward to the roof, constituting the architrave, frieze,

and cornice of the building, which are referred to in the vote of the park commissioners as sculptured ornaments. On the other two sides of the building the walls of a corresponding height are of plain brick. The question arises whether the approval of these ornaments by the park commissioners relieves the building from the prohibition of the statute. It seems to us very clear that it does not. The prohibition against erecting a building above the height of ninety feet is absolute, except that certain erections which are usually above the substantial parts of a building may, with the approval of the park commissioners, be put "on any such building" above that height. These are "steeples, towers, domes, sculptured ornaments, and chimneys." It is only as these become a part of the building by their erection upon it that any part of the building can be built to a greater height than ninety feet. All other parts of the building are left within the prohibition. But the ornaments put upon this building are not "erected on a" building constructed within the limits prescribed for it. We have a building with its solid brick walls extending six feet above the prescribed limit, and its roof at the top, and an enclosure within. The park commissioners, by their approval of certain sculptured ornaments on the face of the wall on two sides of the building, did not assume to approve of other parts of the building which constitute the solid structure, and the statute gave them no authority to approve of other parts of it, or of the building as a whole. The statute intended that the main structure of the building should not extend above the prescribed line, and that only the specified parts which should project above the building proper, might, if approved, be erected on the building. It does not even permit roofs to be built above the line, as did St. 1897, c. 379, which it repeals. What the park commissioners were authorized to do was to approve sculptured ornaments surmounting a ninety foot building; what they have done is to approve the ornamentation of the architrave, frieze, or cornice of two of the four walls of a ninety-six foot building, leaving the other two walls unornamented ninety-six feet in height. In reference to the building proper as distinguished from the ornamentation on the face of two of its walls, the defendants can derive no advantage from the vote of the park commissioners.

It is contended by the defendants that the Attorney General cannot maintain a suit in equity to enforce this statute. His right depends upon the construction put upon the statute. We hold that the statute gives rights in the nature of an easement over lands facing Copley Square, which easement is annexed to the square for the benefit of the public, for whose use and enjoyment Copley Square was laid out; and that these rights are similar in their nature to rights in highways, in great ponds, and in the navigable waters of the Commonwealth. For a deprivation of such public rights, an individual, unless he has suffered damages different in kind from those to the public generally, cannot maintain an action. The Attorney General, as a public officer, represents the public, and may bring all proper suits to protect their rights. The wrong alleged in the present case, if permitted, would work a permanent injury to the public, depriving them of that which the statute gives them. It is a purpresture which, while not in a strict and narrow sense a public nuisance, is in the nature of a public nuisance, is sometimes called a public nuisance, and in equity is to be dealt with as a public nuisance. *Commonwealth* v. *Wilkinson*, 16 Pick. 175. *Attorney General* v. *Boston Wharf Co.* 12 Gray, 553. *Attorney General* v. *Woods*, 108 Mass. 436. *Jenks* v. *Williams*, 115 Mass. 217. *Attorney General* v. *Old Colony Railroad*, 160 Mass. 62. *People* v. *Vanderbilt*, 26 N. Y. 287. In regard to the enforcement of rights given to the public and to other land owners in lands reserved for their use by the Commonwealth, see *Attorney General* v. *Gardiner*, 117 Mass. 492, 499; *Attorney General* v. *Williams*, 140 Mass. 329, 330, 331; *Attorney General* v. *Algonquin Club*, 153 Mass. 447, 454. In England it is held that " the Attorney General has a right to represent the public, either in equity or by prosecution at law, in cases where the public interests are exposed to danger or mischief." *Attorney General* v. *Birmingham & Oxford Junction Railway*, 3 Macn. & G. 453. *Attorney General* v. *Mid-Kent Railway*, L. R. 3 Ch. 100. *Attorney General* v. *Shrewsbury Bridge Co.* 21 Ch. D. 752. *Attorney General* v. *Cockermouth Local Board*, L. R. 18 Eq. 172. In *Attorney General* v. *Jamaica Pond Aqueduct*, 133 Mass. 361, 364, it was said in reference to a great pond that, where an aqueduct corporation proceeds to draw off water to such an extent " as to injure or endanger the rights of

the public therein, an information in equity would furnish the only adequate means of asserting and protecting the rights of the government and of the public." The case of *Attorney General* v. *Abbott,* 154 Mass. 323, under facts very similar to those of the present case, sustains the right of the Attorney General to maintain an information in equity for the protection of public rights in land dedicated to the use of the public as a park. Of similar purport is *Attorney General* v. *Tarr,* 148 Mass. 309, 314. His right in *Attorney General* v. *Revere Copper Co.* 152 Mass. 444, a similar case, was assumed. See also *Attorney General* v. *Metropolitan Railroad,* 125 Mass. 515; *Attorney General* v. *Consumers' Gas Co.* 142 Mass. 417. We are of opinion that the Attorney General is the proper party, and that an information in equity is the proper form of proceeding for the enforcement of public rights against encroachments like those threatened in the present case.

There remains to be considered one other objection to the right of the Attorney General to maintain this suit. It is argued that by St. 1894, c. 257, the city of Boston is given the right to enforce its building laws, that this remedy excludes all others, and that it applies to violations of the St. of 1898, c. 452. It is true that when a statute provides a remedy for violations of it, the remedy is generally exclusive; but if it provides no remedy, relief from wrongs against it is to be sought at common law. *Andover Turnpike* v. *Gould,* 6 Mass. 40, 44. *Wiley* v. *Yale,* 1 Met. 553. *Elder* v. *Bemis,* 2 Met. 599, 604. *United States* v. *Laeschi,* 29 Fed. Rep. 699, and cases cited. St. 1894, c. 257, is as follows: "The supreme judicial court, or any justice thereof, and the superior court, or any justice thereof, in term time or vacation, shall, on the application of the city of Boston by its attorney, have jurisdiction in equity to enforce or prevent the violation of the provisions of the acts relating to the erection or alteration of buildings or other structures in the city of Boston, and may, on such application, restrain the erection, alteration, use, or occupation of any such building or structure which is being, or has been erected or altered in violation of any of the provisions of said acts." It was passed in reference to the elaborate statutes then in force enacted under the police power of the Legislature for the regulation of the erection of buildings in the

city of Boston.   When it was passed, no such statute as that invoked by the Attorney General was contemplated.   Whether the words " acts relating to the erection or alteration of buildings or other structures in the city of Boston " were intended to include any new and independent acts of a kindred character that might afterwards be passed, as distinguished from existing acts and amendments of them, may well be questioned.   The natural construction of the words would make them apply only to conditions then existing.   The statute under which this information is brought, as we construe it, materially differs from the acts relative to the erection of buildings in the city of Boston, existing when the previous statute was passed.   It was enacted for a different purpose.   It creates public rights annexed to public property.   It calls for the payment of damages for the taking of an interest in lands, and exacts the payments from the city of Boston.   The city has a pecuniary interest against the enforcement of the law.   The statute does not provide a remedy for its enforcement, and therefore the remedies must be sought at common law.   The kind of remedy provided by the statute in regard to the building laws gives no security to the public for the protection of their rights, for the party to enforce it has an adverse interest, and cannot be compelled to proceed.   We are of opinion that St. 1898, c. 452, was not intended to create rights enforceable only under St. 1894, c. 257, but creates rights which are enforceable under general laws.   In the opinion of a majority of the court the entry must be,

*Demurrer and pleas overruled.*