# CASES

## ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF MINNESOTA.

STATE EX REL. TWIN CITY BUILDING & INVESTMENT
COMPANY v. JAMES G. HOUGHTON, AS INSPECTOR
OF BUILDINGS OF THE CITY OF MINNEAPOLIS.[1]

October 24, 1919.

No. 21,104.

**Eminent domain — public use — restricted residence district.**

Condemnation cannot be had for a use which is not public, and the
condemnation of property against its use for an apartment building, as
provided by Laws 1915, c. 128, is not for a public use. [See Paragraph 2
below.]

January 23, 1920.

**Subject of act expressed in its title.**

1. The subject of Laws 1915, c. 128, relating to restricted residence
districts in cities of the first class, for the establishment of which con-
demnation is provided, is sufficiently expressed in its title within the
constitutional requirement, though the subject of condemnation is not
mentioned in it.

**Prohibition of apartment houses constitutional.**

2. Laws of 1915, c. 128, provides for restricted residence districts in
cities of the first class in which certain classes of buildings shall not be

[1]Reported in 174 N. W. 885 and 176 N. W. 159.

144 M.—1.

erected. Such restricted district is established by the exercise of the power of eminent domain, and apartment houses, among other classes of buildings, are prohibited therein. The Constitution permits the taking or destruction or damage of private property for public use alone. It is *held* that the restriction as applied to an apartment house is based upon a public use and that the statute providing for condemnation is constitutional.

Upon the relation of the Twin City Building & Investment Company the district court for Hennepin county granted its alternative writ of mandamus directed to James G. Houghton, as inspector of buildings of the city of Minneapolis, commanding him to issue to relator a permit and license to install electric wiring in a certain building, or show cause why he had not done so. The matter was heard before Molyneaux, J., who sustained plaintiff's demurrer to the return of respondent and ordered that the permit issue. From the judgment entered pursuant to the order for judgment, the inspector of buildings appealed. Reversed on reargument.

*C. D. Gould* and *R. S. Wiggin,* for appellant.

The answer set up that on February 23, 1918, relator applied for a permit to build a three-story apartment house at a cost of about $50,000; that on March 8, 1918, the city council passed a resolution pursuant to Laws 1915, p. 180, c. 128, designating the block in which relator's land was situated as a restricted residence district, and directed the building inspector not to issue any permit for the building of any structure prohibited under the resolution; that relator was informed immediately of the action of the council, but made application to the building inspector for a permit for electric wiring in such building which was refused; that no work had been done in construction of the building, and the premises were still vacant and unoccupied.

Chapter 128, p. 180, Laws 1915, is constitutional, and the protection of the public health, safety, convenience and welfare is a public use. The right of eminent domain may be exercised to protect the public health and provide for the public convenience and welfare. Lien v. Board of Co. Commrs. of Norman County, 80 Minn. 58, 62, 82 N. W. 1094. The particular kinds of business prohibited by this act: Coalyards, public garages, public stables, dyeing, cleaning and laundering establishments,

bill-boards and blacksmith shops, have all been held to be such as might be prohibited in any particular district, in the exercise of the police power, even without compensation. Is it not a valid exercise of the power of eminent domain to protect a particular part of the public from the encroachment of such business as the courts say may be protected in the exercise of the police power? In State v. Houghton, 134 Minn. 226, 158 N. W. 1017, the court was careful not to decide whether a mercantile establishment could be prohibited.

The question what is a public use is a question for the court, but necessity or expediency in the exercise of the power of eminent domain for the public use is a question for the legislature. Lewis, Em. Dom. (3d ed.) § 251. See also section 271; Attorney General v. Williams, 174 Mass. 476, 480, 55 N. E. 77; In re City of New York, 57 App. Div. 166, 68 N. Y. Supp. 196, 200, affirmed 167 N. Y. 624, 60 N. E. 1108; Shoemaker v. U. S. 147 U. S. 282, 297, 13 Sup. Ct. 361, 37 L. ed. 170. If the public health, safety, convenience and welfare are protected by the creation of restricted districts, public money may be expended in securing the benefit thereof.

For a use to be public it is not essential that the entire community or any considerable portion of it should directly enjoy or participate in the improvement, for the benefits from it will inure to the use and benefit of the parties concerned, considered as members of the community or of the state, and not solely as individuals, and it is not fatal to the act if private interests be advanced. Sisson v. Supervisors, 128 Iowa, 442, 454, 104 N. W. 454, 70 L.R.A. 440; State v. Board of Co. Commrs. Polk County, 87 Minn. 325, 338, 92 N. W. 216.

*John E. Samuelson, Leonard McHugh* and *M. T. O'Donnell,* as attorneys for the city of Duluth, filed a brief as amici curiae.

The city council of Duluth began proceedings under the act of 1915 to establish a residence district by passing the necessary resolution on June 30, 1919, appointing appraisers and directing the necessary steps to be taken to complete the restrictions, when a property owner in the proposed district filed his complaint to restrain the city from establishing such district and secured an order temporarily restraining the city from proceeding further in the matter, and after a hearing upon an order to show

cause the presiding judge announced he would await the decision of the supreme court in this present case.

A. Where police power is not broad enough, eminent domain may be resorted to. It would seem that the only objection to such restrictions which the court found in the act of 1913 arose from the failure to provide compensation for the prohibition. State v. Houghton, 134 Minn. 226, 158 N. W. 1017. The legislature of 1915 passed the present act to cure this defect. The police power may be evoked without giving compensation, while the power of eminent domain cannot be exercised without giving compensation. The one is usually called a regulation, the other a taking. But either power must be exercised for the public need. If a regulation or restriction on the use of property goes beyond the limits prescribed for the police power, it then falls within the realm of eminent domain. Therefore there is no logical reason why such regulation or restriction may not be imposed under the power of eminent domain, so long as it satisfies the constitutional requirements of giving compensation and being exercised by due process of law.

B. Powers granted by the act of 1915 are for a public use. Public use is the employment or application of a thing by the public, or use by the public. Minnesota Canal & Power Co. v. Koochiching Co. 97 Minn. 429, 107 N. W. 405. Our court qualifies its definition of a public use by giving it the conception of benefit, of public utility and of general welfare. If the charter of the company named had not limited the power of the company to furnishing water from the *wheels thereof,* the court undoubtedly would have sustained the use as a public use. In the case of Minnesota Canal & Power Co. v. Pratt, 101 Minn. 197, 112 N. W. 395, the question of public use did not arise. The public welfare and convenience require that there should be parts of the city wherein the members thereof can erect homes, knowing that they will be able to get away from business buildings and crowded flat buildings and enjoy their homes without annoyance. It cannot be denied that there is a great demand for such places to erect residences, such demands being evidenced by the fact that the state legislature has twice enacted legislation on these lines, and that the councils of St. Paul, Minneapolis and Duluth have promptly taken advantage of such laws to create such districts. It is not necessary

that it should be a use for the entire public. Lien v. Board of Co. Commrs. of Norman County, 80 Minn. 58, 82 N. W. 1094.

Public use may exist in the form of a prohibition of a private use. There are countless cases where the police power has been legally used to serve public uses through prohibition, restriction on the use of private property. There are cases where eminent domain has been used to serve public purposes through a negative use. Attorney General v. Williams, 174 Mass. 476, 55 N. E. 77; In re City of New York, 57 App. Div. 166, 68 N. Y. Supp. 196, affirmed 167 N. Y. 624, 60 N. E. 1108. Restriction of flats from an exclusive residential district serves a public use. Very fine residences are usually surrounded by spacious lawns and plenty of shrubs and trees. Such a district serves the same public use for which parks are created. They are in reality parks maintained at private expense. Every citizen takes pride in such districts and visitors to the city take away with them a fine picture of such city, owing to such districts. Such a restricted residence district prevents congestion which is another public use of health and general welfare.

In the construction of constitutional limitations the courts must keep pace with the times and recognize changing conditions and growing interests. In Noble State Bank v. Haskell, 219 U. S. 575, 31 Sup. Ct. 299, 55 L. ed. 341, upon petition for rehearing, the language of Justice Holmes was that certain cases were cited to show that among *public* uses for which property might be taken, *not for a private use,* were some which, if looked at only in their *immediate aspects,* might seem to be private. This case is of that character.

*A. B. Darelius,* for respondent.

The act of 1915 is invalid because it contravenes article 4, § 27, and article 1, § 13, of the state Constitution. The condemnation of private property, or rather the taking away the right of the property owner to improve his property in his own way is not embraced within, or suggested by, the title of the act. The title gives no suggestion of the right of the city to take property in connection with the creation of such residence districts. State v. Kinsella, 14 Minn. 395, 397 (524). Section 13 of article 1 prohibits the taking of private property except for a public use. Private property cannot be taken for a private use. State v. District Court, 133 Minn. 221, 158 N. W. 240. Sections 22 and 23 of

R. C. L. enumerate what is a public use. The taking of relator's property does not come within either of the classes enumerated. City of Minneapolis v. Janney, 86 Minn. 11, 90 N. W. 312; Minnesota Sugar Co. v. Iverson, 91 Minn. 30, 97 N. W. 454. Appellant does not contend that the erection of an apartment house on the designated premises will constitute a nuisance, a menace to health or be dangerous to life or limb or even offensive to aesthetic taste. If it is a benefit at all to exclude such improvements, it is purely a private benefit.

It is simply to prevent overcrowding and congestion in, the larger cities. To prevent the building of undesirable and unhealthy structures, the shutting out of light and air, the housing act of 1917 (chapter 137, page 185), was enacted by the legislature.

*Baldwin, Baldwin & Holmes* filed a brief as amici curiae.

Unless the taking be for a public use the act of 1915 is invalid, as otherwise it violates article 1, § 7, of the state Constitution and the Fourteenth Amendment of the Federal Constitution, both relating to due process of law. By the restriction neither the public, nor its agents, have the right to enter upon, use or enjoy these premises in any way, nor to regulate their use save by the prohibition of these harmless projects. What is secured is the right to prohibit, not a right to use. Put in another way, the city has sought to acquire the right to pass what is essentially a police ordinance, held invalid as to such projects under the police power. See 1 Minn. Law Rev. 490. Is the expansion of the police power beyond its constitutional limits the taking or damaging of property "for public use?" See State v. Houghton, 134 Minn. 226, 158 N. W. 1017, for a satisfactory definition of the limits of police power applicable here.

Minnesota is expressly committed to the doctrine that "public use" means actual "use by the public." Minnesota Canal & Power Co. v. Koochiching Co. 97 Minn. 429, 107 N. W. 405. Hence it is obvious that as this ·right involves no user or taking possession by the public or its agents it cannot be acquired as a public use. What interest or benefit has anyone in this project except the immediate landowners of the residence district involved, and possibly of the immediately adjacent property? But if none but the immediate neighborhood is benefited, then under the rule the use is not a public use.

The following opinions were filed October 24, 1919:

DIBELL, J.[1]

Mandamus on the relation of the Twin City Building & Improvement Company against James G. Houghton, inspector of buildings of Minneapolis, to compel him to issue a building permit. There was an answer to the alternative writ to which a demurrer was sustained and judgment was then entered for the relator from which the defendant appeals.

The question is upon the right of the relator to construct a three-story apartment building upon property which he owns in Minneapolis. His right to do so is conceded, unless he is prevented because of certain proceedings taken by the common council of Minneapolis, pursuant to Laws 1915, p. 180, c. 128, resulting in the designation of block 8 in J. T. Blaisdell's Revised Addition to Minneapolis as a restricted residence district in which the construction of such a building is prohibited. The relator owns lot 13 and the south 34.9 feet of lot 12 in this block and purposes erecting an apartment building. Sections 1 and 2 of the act of 1915 are as follows:

Section 1. Any city of the first class may, through its council, upon petition of fifty (50) per cent of the owners of real estate in the district sought to be affected, designate and establish by proceedings hereunder restricted residence districts within its limits wherein no building or other structure shall thereafter be erected, altered or repaired for any of the following purposes, to-wit, hotels, restaurants, eating houses, mercantile business, stores, factories, warehouses, printing establishments, tailor shops, coal yards, ice houses, blacksmith shops, repair shops, paint shops, bakeries, dyeing, cleaning and laundering establishments, bill-boards and other advertising devices, public garages, public stables, apartment houses, tenement houses, flat buildings, any other building or structure for purposes similar to the foregoing. Public garages and public stables shall include those, and only those, operated for gain.

Nothing herein contained shall be construed to exclude double residences or duplex houses, so-called, schools, churches, or signs advertising for rent or sale the property only on which they are placed.

No building or structure erected after the creation of such district shall be used for any purpose for which its erection shall be prohibited hereunder.

[1][See third paragraph on page 21.]

The term "council" in this act shall mean the chief governing body of the city by whatever name called.

Sec. 2. The council shall first designate the restricted residence district, and shall have power to acquire by eminent domain the right to exercise the powers granted by this act by proceedings hereinafter defined, and when such proceedings shall have been completed the right to exercise such powers shall be vested in the city.

If under this statute the relator's property can be condemned against its use as a site for an apartment building, it is not aggrieved, and the only question which we find necessary to determine is whether there is a public use upon which to rest a condemnation.

The right to condemn private property for public use is not questioned. It is an attribute of sovereignty. The private owner holds his property subject to the superior right of the state to take it for public use, but it cannot take it except for public use. The payment of compensation gives no right. It is a condition to the exercise of the right. Whether the use is a public use is a judicial question. The courts are charged alike with the duty of giving effect to the sovereign right to take and of protecting the individual against an appropriation for other than a public use.

The right of the owner to use his property as he sees fit, if he does not unjustly injure others, is as much unquestioned as is the sovereign right to take it for public use. It is fundamental in our government. It makes ownership valuable and attractive. It is a right cherished as an incident of our free institutions. Its exercise is an affirmation of the equality of all before the law and a denial of class superiority. Of course the private owner may be restricted in the use of his property without its appropriation by condemnation. He is only one of the community. He must yield to its welfare. He must not use his property so as unnecessarily or unjustly to interfere with others. He must not create a nuisance. His protected private right is subject to the exercise of the police power resident in the state to prohibit, and this without compensation, a use of his property which injuriously affects the public health or safety or general convenience and welfare of the community.

The use to which the relator purposes putting its property is legitimate. Not all people can live or wish to live in detached houses. Some

from choice and some from necessity seek apartments. It is true that apartment buildings are not welcome in exclusive residence districts. Their appearance is not liked. They bring more people into the neighborhood and their presence there and their going and coming is thought by some undesirable. It is not sought to prohibit apartments, nor to prevent people living in them. It is proper enough that apartments be located elsewhere and that people live in them there, for the living conditions they offer are wholesome and the people who use them are good people. They are banned because of the environment. An apartment building does not affect the public health or public safety or general well being so that it may be prohibited in the exercise of the police power. This we take to be the effect of our decisions. State v. Houghton, 134 Minn. 226, 158 N. W. 1017, L.R.A. 1917F, 1050; State v. City of Minneapolis, 136 Minn. 479, 162 N. W. 477. If such a building affects the public health or safety or well being of the community within the meaning of the police power, it can be outlawed by ordinance or statute without condemnation and accompanying compensation, and there is no need of condemnation against a nuisance. It is only when something rightfully belonging to another is to be taken from him in the exercise of the superior sovereign right for a necessary public use that resort need be had to condemnation.

By the condemnation which the statute provides neither the city nor the general public gets a physical use of the condemned premises. They cannot use them in any way. They do not wish to use them in the ordinary sense. They do not want them used for an apartment. They cannot go upon them. The so-called use is negative; it prevents an otherwise lawful use by the owner and in no other way is it a use at all. He still owns the land, and can keep people off it. He may leave it vacant. He may build any kind of a building which he chooses except one forbidden by the statute. A fifty per cent vote, with the approval of the common council, has made it so if it is so. It is not so unless the use is public.

When once the principle is announced, that a residence district may be created by the common council upon a majority vote of the owners and the land condemned against the use of the property for an apartment building, the way is open for the condemnation, upon legislative authori-

zation, of property in exclusive residence districts against a use for substantially any class of dwellings then thought to be not in keeping with community surroundings. It may reach the humble and shabby dwelling, for such a dwelling may be found objectionable as readily as an apartment. And when the humble home is threatened by legislation upon aesthetic grounds, or at the instance of a particular class of citizens who would rid themselves of its presence as not suited in architecture or in other respects to their own more elaborate structures, a step will have been taken inevitably to cause discontent with the government as one controlled by class distinction, rather than in the interests and for the equal protection of all. It is not believed that the public welfare can be promoted by such legislation.

We do not overlook nor discourage the tendency to extend the power of restriction of the use of city property through the exercise of the police power in aid of more wholesome and sanitary living conditions. The housing act of 1917, not yet construed, is an illustration. Laws 1917, p. 185, c. 137. The act of 1915, as applied to the situation before us, has no purpose to improve housing conditions. The tendency noted is illustrated in State v. Houghton, 142 Minn. 28, 170 N. W. 853, where we held that the exclusion of a factory manufacturing cereal products from a restricted residence district, created pursuant to Laws 1913, pp. 102, 618, cc. 98, 420, was sustainable under the police power, though the district was sparsely settled, and though the property was naturally suited for the use of such a factory located as it was on a railway line, but the use of the factory involved substantial physical discomfort and annoyance to the residents. In many ways, not worth the while mentioning here, one may, by legislation under the police power, be restricted in the use of his property. Dunnell, Minn. Dig. and 1916 Supp. § 1603, et seq. And as a matter of private right, without legislation under the police power, we sustain an interference by injunction with the operation of a stone quarry so conducted as to bring substantial physical discomfort and annoyance to nearby residents. Brede v. Minnesota Crushed Stone Co. 143 Minn. 374, 173 N. W. 805. And in the same way we sustain a restriction of the use of property for stabling purposes. Lynch v. Shiely, 131 Minn. 346, 155 N. W. 958.

The case before us is not in principle nor in facts like In re City of

New York, 57 App. Div. 166, 68 N. Y. Supp. 196, where there was a condemnation for the purpose of widening a street by adding a strip on each side, which was not to be used for purposes of travel but for ornament and beauty, with a reservation of a limited use in the owner. Nor is it like Bunyan v. Commissioners, 167 App. Div. 457, 153 N. Y. Supp. 622, where land used as a stone quarry along the Palisades of the Hudson was condemned for the purpose of preserving the scenic beauty of the river and the park. Nor is it like Attorney General v. Williams, 174 Mass. 476, 55 N. E. 77, 47 L.R.A. 314, where a statute limiting the height of buildings about Copley Square and providing for compensation was sustained. Nor is it like U. S. v. Gettysburg Electric Ry. Co. 160 U. S. 668, 16 Sup. Ct. 427, 40 L. Ed. 576, where there was a condemnation for preserving, improving and ornamenting the battle-field of Gettysburg. These uses were public.

No question is made of the right under proper authorization to condemn property for boulevards or for pleasure drives or for public parks or for public baths or for public playgrounds or for libraries and museums or for numerous other purposes which contribute to the general good and well-being of the community. In such cases there is a public use. In the condemnation here we see none. The desire of exclusive residence districts to preserve their environment is worthy enough. In condemning property against a building which is in itself proper and useful and offends only because it is out of harmony with the neighborhood surroundings we do not find a public use. We recognize that what constitutes a public use changes from time to time. Many uses recognized as public now were not thought so some years ago. We think the use here claimed as public is, within the meaning of the law of eminent domain, private. Considerable is made of the requirement of compensation, the provision for getting which, it may be remarked in passing, is made studiously difficult, but without a public use a provision for compensation is unimportant.

Numerous helpful briefs have been filed by counsel not appearing for the parties to the record but representing those having interests which will be affected by the decision. They have had attentive consideration. We have not mentioned all of the questions argued. Whether aside from the want of a public use there is anything in this ingeniously drastic

statute which makes it invalid we do not inquire and our decision is limited to the precise facts before us. A condemnation against an apartment house is not for a public use.

Judgment affirmed.

HOLT, J. (dissenting).

I dissent. General or public welfare is a legitimate field for legislative activity. The legislature, in the first instance, must ascertain and determine what makes for public welfare in enacting laws designed to secure or promote the same. Courts should not lightly set aside such determination.

Reference need only be made to a few of the many existing conditions which would seem to justify the law here questioned. People are crowding into cities where the individual ownership of land is restricted to small parcels. This calls for a delicate observance and application of the rule sic utere tuo ut alienum non laedas. Courts often use that rule to prevent or redress an injury. And why may not the legislature do likewise when occasion arises? A person buys a 30 or 40 foot lot in a residence district and erects a modest building for a home. Later others secure two or more lots on each side of him and proceed to erect three or more story apartments or business buildings, placing the structures clear up to the lot lines. Is there any doubt but that the small home first built is utterly destroyed so far as comfortable enjoyment goes and its value almost entirely obliterated? We also know how often the unrestricted use of city lots serves as a means of extortion for the unscrupulous speculator who buys a lot in a desirable residence neighborhood, and then threatens to erect a structure which in appearance, or in the use for which it is designed, will greatly depreciate the surrounding property and be an eyesore to the occupants or owners thereof. To avoid the threatened loss and annoyance, the neighbors are forced to buy the lot at the exorbitant price fixed, or submit to the injury. It seems to me that public welfare is clearly served when communities who desire protection against wrongs and inconveniences of the kind suggested may secure the same. That which is appropriated for public welfare is taken for public use. That the right appropriated under this law may be en-

joyed in full only by a limited district or community does not prove that it is not for public use.

It is about time that courts recognize the aesthetic as a factor in the affairs of life. Who will dispute that the general welfare of dwellers in our congested cities is promoted if they be allowed to have their homes in fit and harmonious or beautiful surroundings? Besides preserving and enhancing values it fosters contentment, creates a wholesome civic pride, and is productive of better citizens. City planning by which mercantile and industrial establishments, hotels, apartments, and the individual homes are segregated seems to me to be a public need that should invite the hearty co-operation of all the governmental departments. When property rights are taken or effected for this object there is a taking for a public use. The legislature so deemed it. Its judgment should be respected by the courts. There is nothing in the Constitution, Federal or state, which compels a holding that the taking authorized by this statute is not for public use.

That compensation is provided for the private interests affected by the establishment of restricted building districts, cannot tend to invalidate the law. It must have the contrary effect, for thereby is removed the chief objection that an owner can have against interference with the use of his property. The compensation part of the statute might have been more attractive had there been given an opportunity to secure an award from a jury. But the one provided was held constitutional by this court as long ago as in Ames v. Lake Superior & Miss. R. Co. 21 Minn. 241.

HALLAM, J. (dissenting).

I concur with Justice Holt.

After reargument the following opinions were filed January 23, 1920:

HOLT, J.

Mandamus on relation of the Twin City Building & Improvement Company against James G. Houghton, inspector of buildings of Minneapolis, to require him to issue it a building permit. There was an answer to the alternative writ to which a demurrer was sustained, and judgment was then entered for the relator, from which the defendant appeals.

The only question is upon the constitutionality of Laws 1915, p. 180,

c. 128. The relator claims that the statute is unconstitutional, because its subject is not expressed in its title, and because the use for which it is proposed to exercise the power of eminent domain is not a public use.

1. The act is entitled: "An act authorizing cities of the first class to designate and establish restricted residence districts and to prohibit the erection, alteration and repair of buildings thereon for certain prohibited purposes." It provides for establishing restricted residence districts by condemnation. The claim of the relator is that the subject of the act is not expressed in its title within the constitutional requirement. Const. art. 4, § 27. We have given this matter consideration and reach the conclusion that the subject of the act is sufficiently expressed in its title. The matter has been gone over frequently and the question does not call for discussion. Dunnell, Minn. Dig. and 1916 Supp. § 8906, et seq.

2. The remaining question is whether there is any public use in aid of which the right of eminent domain may be used.

On March 8, 1918, the city council passed a resolution pursuant to Laws 1915, p. 180, c. 128, designating block 8 in J. T. Blaisdell's Revised Addition of Minneapolis as a restricted residence district. The relator owns lot 13 and the south 34.9 feet of lot 12 in this block. It was proposing to erect a three-story apartment building costing approximately $50,000, and for this building a permit for certain parts of the structure was asked and denied. Laws 1915, p. 180, c. 128, provide for the designation by the common council of restricted residence districts and the prohibition of the erection therein of buildings of a certain class, including such as the apartment building intended by the relator. Sections 1 and 2 of the statute, important here, are as follows:

Section 1. Any city of the first class may, through its council, upon petition of fifty (50) per cent of the owners of the real estate in the district sought to be affected, designate and establish by proceedings hereunder restricted residence districts within its limits wherein no building or other structure shall thereafter be erected, altered or repaired for any of the following purposes, to-wit, hotels, restaurants, eating houses, mercantile business, stores, factories, warehouses, printing establishments, tailor shops, coal yards, ice houses, blacksmith shops, repair shops, paint shops, bakeries, dyeing, cleaning and laundering establishments, bill-

boards and other advertising devices, public garages, public stables, apartment houses, tenement houses, flat buildings, any other building or structure for purposes similar to the foregoing. Public garages and public stables shall include those, and only those, operated for gain.

Nothing herein contained shall be construed to exclude double residences or duplex houses, so-called, schools, churches, or signs advertising for rent or sale the property only on which they are placed.

No building or structure erected after the creation of such district shall be used for any purpose for which its erection shall be prohibited hereunder.

The term "council" in this act shall mean the chief governing body of the city by whatever name called.

Section 2. The council shall first designate the restricted residence district, and shall have the power to acquire by eminent domain the right to exercise the powers granted by this act by proceedings hereinafter defined, and when such proceedings shall have been completed the right to exercise such powers shall be vested in the city.

The Constitution provides that "private property shall not be taken, destroyed or damaged for public use, without just compensation therefor first paid or secured." Const. art. 1, § 13. The parties agree that the only question involved, the question of the title aside, is the constitutionality of the statute under the eminent domain provision of the Constitution. That question is the single question whether the legislature may authorize a common council to establish by condemnation a restricted residence district, which shall exclude apartment buildings, and that question is whether there is a public use in such restriction.

That the public gets no physical use of the premises condemned is clear. It cannot travel upon or occupy them. The use acquired so far as the general public is concerned is rather negative in character, except, perhaps, that its sense of the appropriate and harmonious will not be offended by the erection in the condemned district of proscribed buildings. The condemnation does not take any part of the ground away from the owner; the taking consists in restricting its use. He is compensated for the restriction imposed, but compensation is merely an incident to the

exercise of the right of condemnation, and without a public use to be served gives no right.

Naturally enough we do not find parallel cases. It is not supposed that a considerable portion of the public will derive benefit from the restriction. This is evidenced by the requirement that the condemnation money ultimately be paid from assessments for benefits to the restricted district, which in this case is one block. It is not paid out of the general fund, though the city's credit is pledged for it. It is treated much as a local benefit or use; but this fact, or the fact that only a small part of the public is appreciably or directly benefited does not make the use not public. 10 R. C. L. p. 31. "In holding a use to be public, it has never been deemed essential that the entire community, or any considerable portion of it, should directly enjoy or participate in the improvement or enterprise." Sisson v. Supervisors, 128 Iowa, 442, 104 N. W. 454, 70 L.R.A. 440.

The notion of what is public use changes from time to time. Public use expands with the new needs created by the advance of civilization and the modern tendency of the people to crowd into large cities. Such a taking as here proposed could not possibly have been thought a taking for public use at the time of the adoption of our Constitution when the state was practically a wilderness without a single city worthy of the name. "The term 'public use' is flexible, and cannot be limited to the public use known at the time of the forming of the Constitution." Stewart v. Great Northern Ry. Co. 65 Minn. 515, 68 N. W. 208, 33 L.R.A. 427. What constitutes a public use at the time it is sought to exercise the power of eminent domain is the test. The Constitution is as it was when adopted, but, when it employs terms which change in definition as conditions change, it refers to them in the sense in which they are meant when the protection of the Constitution is sought. The Constitution of this state nowhere attempts to define what may be a public use, nor does it prohibit the legislature from determining what shall be deemed such a use.

In comparatively recent times it was questioned whether a public use extended so far as to justify the condemnation of property and the expenditure of money for public parks, or for boulevards, or for pleasure drives, or for public baths, or for playgrounds, or for libraries and muse-

ums or for numerous other purposes which contribute to the general good. Now condemnation and expenditure for these and like or similar purposes is common, and recognized as lawful. Not so very long ago there would have been a revolt against restricting a property owner in the full use of his lot to the street line. But a condemnation for the purpose of widening a street by adding a strip on each side which is not to be used for travel, but for ornament and beauty, and with the reservation of a limited use in the owner, is held valid. In re City of New York, 57 App. Div. 166, affirmed in 167 N. Y. 624, 60 N. E. 1108. The taking of land used as a stone quarry along the Palisades of the Hudson, for the purpose of preserving the scenic beauty of the river and of the park, has been sustained as a taking for public use. Bunyan v. Commissioners, 167 App. Div. 457, 153 N. Y. Supp. 622. A case often cited is Attorney General v. Williams, 174 Mass. 476, 55 N. E. 77, 47 L.R.A. 314, where a statute limiting the height of buildings about Copley Square, on compensation paid, was sustained. And condemnation was sustained for preserving and improving and ornamenting the battle-field of Gettysburg. United States v. Gettysburg Ele. Ry. 160 U. S. 668, 16 Sup. Ct. 427, 40 L. ed. 576. The condemnation was thought clearly for a public use.

In the prevailing and dissenting opinions in State v. Houghton, 134 Minn. 226, 158 N. W. 1017, L.R.A. 1917F, 1050, where the question was upon the propriety of the exclusion of a store from a restricted residence district under the police power, there was a thorough examination of the authorities, many of which are of value here, but they do not call for reconsideration. The right to restrict under the police power without compensation, and to restrict by condemnation with compensation, differ, but have much in common. It is likely that many of the businesses and buildings referred to in the statute could be excluded under the police power. It is unnecessary to cite or discuss authorities at length, but the following may be noted: Nichols, Em. Dom. §§ 40, 58, 100, 101; 1 Lewis, Em. Dom. § 271, et seq.; 2 Dillon, Mun. Corp. § 695; 10 R. C. L. 36; 4 McQuillin, Mun. Corp. § 1485, et seq.; 20 Harvard Law R. 35; 27 Harvard Law R. 665; 15 Michigan Law R. 75; 1 Minn. Law R. 489.

The tendency is in the direction of extending the power of restriction, either through the exercise of the police power or the exercise of the right

of eminent domain, in aid of the so-called city planning or the improvement of housing conditions  Our elaborate Housing Code of 1917 is an illustration of an effort.on the part of the state, through the exercise of the police power, to so regulate the construction of buildings that living conditions shall be better.  Chapter 137, p. 185, Laws 1917.  The tendency is also illustrated by such decisions as State v. Houghton, 142 Minn. 28, 170.N. W. 853, where we held that the exclusion of a factory, manufacturing cereal products, from a residence district, was sustainable under the police power, although the district was sparsely settled, and of the ordinary class of dwellings, and though the property was naturally suited for the use of such a factory, located as it was on a railway line.

The expression is often found in the decisions that whether a use is public is a judicial question.  No doubt it needs be where the legislature has not attempted to designate or define the public use for which condemnation is sought.  Justice Mitchell, in Fairchild v. City of St. Paul, 46 Minn. 540, 49 N. W. 325, in speaking of the limitation upon the power of eminent domain, said: "Of course, there is the further limitation, necessarily implied, that the use shall be a public one; upon which question the determination of the legislature is not conclusive upon the courts." This implies that in the first instance the legislature may designate what is a public use for which condemnation can be exercised. "The question as it presents itself to the courts is not whether the use is public, but whether the legislature might reasonably have considered it public.  The presumption is that a use is public if the legislature has declared it to be such, and the decision of the legislature must be treated with consideration due to a co-ordinate department of the government of the state."  10 R. C. L. pp. 29, 30, and, among the cases there cited, we find Justice Marshall, in Chicago & N. W. Ry. Co. v. Morehouse, 112 Wis. 1, 87 N. W. 849, 56 L.R.A. 240, 88 Am. St. 918, conceding that "the right to declare what shall be deemed a public use" being "vested primarily in the legislature."  In Bankhead v. Brown, 25 Iowa, 540, Justice Dillon said: "If a public use be declared by the legislature, the courts will hold the use public, unless it manifestly appears by the provisions of the act that they can have no tendency to advance and prosecute such public use."

Instead of it manifestly appearing that the legislature has authorized

the taking for a use not public, by the law in question, we think good reason exists for saying that the restrictions which may be imposed upon the owner of property, under the provisions of the act, constitute a taking for a public use. That the act unmistakably implies that the taking, or the restricting, is deemed to be for a public use is clear from the fact that condemnation is the means employed to achieve the end in view. No one will gainsay that the chief aim of all legislation is the general good, or public welfare. Legislators must ascertain and determine what makes for public welfare, in order to enact laws designed to promote and secure the same.

Many reasons might be suggested as sufficient for the adoption of this statute. We will mention but one or two.

It must be admitted that owners of land in congested cities have of late, through selfish and unworthy motives, put it to such use that serious inconvenience and loss results to other landowners in the neighborhood. In large cities, where the lots for residences must necessarily be of the minimum size, especially where the man of small means must dwell, it is readily seen that if a home is built on such a lot and thereafter three-story apartments extending to the lot line are constructed on both sides of the home it becomes almost unlivable and its value utterly destroyed. Not only that, but the construction of such apartments or other like buildings in a territory of individual homes depreciates very much the values in the whole territory. The loss is not only to the owners, but to the state and municipality by reason of the diminished taxes resulting from diminished values.

The absence of restrictions of use also gives occasion for extortion. The occurrences have been common in our large cities of unscrupulous and designing persons securing lots in desirable residential districts, and then passing the word that an apartment or other objectionable structure is to be erected thereon. In order to protect themselves against heavy loss and bitter annoyance the adjacent owners, or parties interested in property in the neighborhood, are forced to buy the lots so held at exorbitant price. The well-to-do may in this way be able by financial sacrifice to protect their homes against undesirable invasions. But when this occurs in territory occupied by people of modest homes and moderate means, where all they have is represented by the home and that, perhaps, not

free of mortgage lien, there is nothing to do but to submit to the loss and the injustice. There should be a lawful way to forestall such wrongs. Courts have often resorted to the rule sic utere tuo alienum non laedas in administering justice between property owners. Why should not the legislature also make use of this rule?

Another reason is that giving the people a means to secure for that portion of a city, wherein they establish their homes, fit and harmonious surroundings promotes contentment, induces further efforts to enhance the appearance and value of the home, fosters civic pride and thus tends to produce a better type of citizen. It is time that courts recognized the aesthetic as a factor in life. Beauty and fitness enhance values in public and private structures. But it is not sufficient that the building is fit and proper, standing alone, it should also fit in with surrounding structures to some degree. People are beginning to realize this more than before and are calling for city planning, by which the individual homes may be segregated from not only industrial and mercantile districts, but also from the districts devoted to hotels and apartments. The act in question responds to this call and should be deemed to provide for a taking for a public use. In Commonwealth v. Boston Adv. Co. 188 Mass. 348, 74 N. E. 601, 69 L.R.A. 817, 108 Am. St. 494, is this language: "We agree that the promotion of the pleasure of the people is a public purpose for which public money may be used and taxes laid, even if the pleasure is secured merely by delighting one of the senses." There it was sought to prevent bill-boards on private property adjoining parks, but the court held it could not be done without compensation. The inference from the reasoning is that the law authorizing the rule prohibiting the bill-boards would have been sustained had the restriction upon the owner's use been acquired by condemnation.

Closely analogous to this law is the drainage act, which was upheld in Lien v. Board of Co. Commrs. of Norman County, 80 Minn. 58, 82 N. W. 1094. It was there stated that all courts sustained such laws "when enacted in the interest of the public health, convenience or welfare." That act left the county commissioners to determine whether the proposed drainage would be "of public utility, or conducive to public health, or of public benefit or convenience." Many of the drainage projects established under this law have no direct effect on the public at large. In

many cases the public acquires no more right to pass over or to occupy any part of the land of the drainage system than the public, as such, does under the taking in the act under consideration. The direct benefits are to the individuals owning the land comprising the drainage district, the same as to the owners of lots in the restricted building district. The. public health proposition is really of no more actual consequence in the one than in the other. We think there is a public use served by the taking authorized by chapter 128, p. 180, Laws of 1915. It does not seem to impinge any inhibition of state or Federal Constitution.

Given a public use, the propriety and necessity of the taking and the mode prescribed for the compensation are for the legislature. State v. District Court of Fourth Judicial District, 133 Minn. 221, 158 N. W. 240. We are concerned only with the question of the constitutionality of the statute as against the two objections urged and above disposed of. There may be some provisions in the act which permit of an oppressive use, under certain conditions, but we are not interested in them at present. The method of compensation might have been more attractive had it afforded the right to a jury award. But the one provided was held constitutional as long ago as in Ames v. Lake Superior & M. R. Co. 21 Minn. 241.

The former opinion rendered herein is overruled.

The judgment is reversed.

BROWN, C. J. and DIBELL, J. (dissenting).

We adhere to the views expressed in the former opinion.

The reargument brings nothing of moment that is new. It cannot be successfully urged that there is a public use upon which to rest a condemnation, which will prevent an owner from building upon his private property an apartment, upon the sole claim, assumed to be well founded, that his building deteriorates property values in the vicinity. If this is so the owner of vacant land may be restricted in its improvement to such a use as leaves values stationary or enhances them. The suggestion that a condemnation such as is sought can be supported to prevent extortion we cannot accept as sound. No public use can be found and condemnation money is not paid as tribute. Nor unless the prevailing opinion changes the law of the state can it be rightly said that the question

whether a use is a public use is not strictly a judicial one. Dunnell, Minn. Dig. and 1916 Supp. § 3027.

The maxim, sic utere tuo ut alienum non laedas, quoted in the prevailing opinion, is not a foundation principle of eminent domain. It finds application in the exercise of the police power under which restrictions are imposed without compensation, and it states a principle which we apply in controversies between conflicting private owners. Under the police power, with some reference to this principle, we support restrictions upon the use of private property in a way substantially interfering with the rightful enjoyment by another of his private property. State v. Houghton, 142 Minn. 28, 170 N. W. 853, where a cereal factory, the conduct of which substantially annoyed the residents of the community because of noise and dust, was excluded, is an illustration. And in a controversy between private parties, and without a resort to the police power, we restrict the use of private property when it brings substantial physical discomfort to residents of the community, as when it is used for a stone quarry or for stabling purposes. Brede v. Minn. Crushed Stone Co. 143 Minn. 374, 173 N. W. 805; Lynch v. Shiely, 131 Minn. 346, 155 N. W. 390.

However far we follow the arguments we return to the question whether a residence district, voluntarily organized under legislative authorization upon a 50 per cent vote, may exclude from its midst apartment buildings, which are thoroughly sanitary and which furnish satisfactory dwelling places to large numbers of our people who either cannot live or do not choose to live in detached dwellings with more or less commodious grounds surrounding. If there may be such an exclusion there may be a like exclusion of an unsightly cottage, which is the only possible home the owner of the land can build or have, whenever it is displeasing to the composite good taste of the community; and by a like exclusion the architectural fashion of a community may be fixed. Back of all the suggestion of aesthetic considerations, and potent in urging the result here sought to be attained, is the disinclination of the exclusive district to have in its midst those who dwell in apartments. It matters not how mentally fit or how morally correct or how decorous in conduct they are; they are unwelcome. The exclusive district is unwilling to battle with the economic law which changes the character of residence districts as

time goes, or the natural instinct which prompts flat-dwellers to seek agreeable surroundings; and so it asks the exercise in its behalf of the state's power of eminent domain. It is the same feeling which often finds expression in the making of distinctions based on race or nationality or upon natural or artificial social status. All talk of beautifying parks and public squares and boulevards and establishing playgrounds is quite beside the present discussion. No one questions the public use which justifies condemnation and taxation for them. This court readily gives relief, in a proper case, to a private owner whose right to the enjoyment of his property is interfered with by another private owner not using his own with a just regard to the enjoyment of his neighbor, but it has not given effect to class distinctions imposed by law.

In conclusion, and without further discussion, our judgment is that the present decision is without constitutional basis for its support, and is directly opposed to the fundamental principle that one may use and enjoy his property as best suits his convenience, so long as no unnecessary injury is done to his neighbor. The statute in question is aimed in the wrong direction, and not in promotion of the general welfare, as that term for many years has been understood and applied by the courts. The intelligent thought of the day notes with some concern the increasing unrest and discontent with the trend of our civil affairs, prevalent among the people not only of this state and nation, but the world over. Yet that same intelligence, apparently without thought or reflection, at the same time demands the enactment and enforcement of laws, the only tendency of which is to add to and accentuate in a measure conditions made the basis of such discontent—legislation, like the statute here involved, which in effect segregates the people into classes founded on invidious distinctions, extending to one thereof by positive law the powerful eminent domain arm of the state, by which one class may, on aesthetic or fanciful grounds, exclude from their selected neighborhood members of the other classes, and thus deprive them arbitrarily of the free enjoyment of their property, although they may be of equal intelligence and moral standing with those thus temporarily vested with the use of that powerful state weapon. Heretofore the people in this country have been permitted to work out their own social relations unaided by direct legislation. And those who are willing to take cognizance for the moment of the history

of civil governments and of the reasons for the downfall of many of them cannot but be impressed that the general welfare will best be promoted by a continuance of that method of regulating matters of that kind. This case, briefed favorably to the result by both lawyers and editors, will create no disturbance nor attract any special attention. The statute which is sustained is but a straw indicating a drifting from constitutional moorings toward class distinctions created and fostered by law.