Kramer, J.
This ease is an action in mandamus to compel the building inspector of the city of East Cleveland to issue permits to one Max Morris to erect certain apartment houses upon Stanwood and Grasmere streets in that city. The case is before this court for rehearing, it having heretofore been determined against the relator, the opinion of the court (Foran, J.), being published in the Ohio Law Bulletin of March 15, 1920, at page 98. From that opinion it would appear that the facts which appear upon rehearing are substantially the same as appeared in the case when heard previously.
The facts, in so far as they relate to the issues here made, are as follows:
The city of East Cleveland, in Cuyahoga county, has a commission form of government, operating under a charter, duly adopted, providing for local self-government, according to the Constitution of Ohio.
*550 On July 15, 1919, the city commission of the city of East Cleveland passed ordinance No. 1220, entitled, “An emergency ordinance, adopting a building zone plan for the city of East Cleveland, establishing and fixing the boundary of building zones, and regulating the location, erection, use and maintenance of all buildings therein.”
By this ordinance the city was divided into certain sections or districts, called zones, which zones were classified under the designations “A,” “B,” “C” and “D,” as shown by the map here in evidence. The territory included, in Zone “A,” was left unrestricted; Zone “B” was restricted against manufacturing use; Zone “C” was restricted against manufacturing and business use, while Zone “D” was restricted against manufacturing, business and tenements.
Section 5 of said ordinance provided that—
“No building or buildings shall be hereafter located, erected, used or maintained in Zone ‘D,’ as a tenement building, place of business, or manufacturing plant, intending hereby to restrict Zone ‘D’ for use as single and double residence property only.”'
In the month of July, 1919, the relator, Max Morris, a building contractor, acquired certain property, located on Grasmere street and Stanwood road, in the city of East Cleveland, and located about 150 feet south of Euclid avenue; this property being within Zone “D.”
The relator filed his applications for building permits to erect eight apartments on this property, these apartments being buildings of the class not permitted to be erected by the ordinance, within Zone “D.” Thereafter, and after the passage of the ordinance, the defendant, M. W. Garnett, building inspector of the city of East Cleveland, refused to issue the permits. The application for permits, and the plans and specifications filed therewith, were in full compliance with the building code of the city of East Cleveland, and the building code of the state of Ohio. The permits were refused by the defendant, M. W. Garnett, building inspector of the city of East Cleveland, specifically and solely upon the ground that the erection of the *551 proposed apartments would be contrary to and against the provisions of the ordinance here in question.
It is claimed by the relator that the ordinance, under which the permission to build was refused to him, is void, in that it works a taking of his property without compensation, and without due process of law, and that it denies him the equal protection of the laws, in violation of the Constitution of Ohio, Article I, Section 1, and Section 19; the Constitution of the United States, Article XIV, Section 1; the Fourteenth Amendment, Section 1 and the Fifth Amendment.
The defendants allege that the ordinance is a valid exercise of the police power, granted to the city under the Constitution of the State of Ohio, which provides (Art. XVIII) :
“Sec. 3. Municipalities shall have authority to exercise the powers of local self-government, and to adopt and enforce within their limits such local, police, .sanitary and other similar regulations as are not in conflict with general laws.”
‘ ‘ Sec. 7. A municipality shall have the power to frame, adopt or amend the charter for its government, and may, subject to the provisions of Section 3 of this Article, exercise thereunder all powers of local self-government.”
By the charter of East Cleveland, Section 1, it is provided that it—
“may define, prohibit, abate, suppress and prevent all things detrimental to the health, morals, comfort and safety, convenience and welfare of the inhabitants of the city, and all nuisances and causes thereof.”
There is no question made here, but that the city of East Cleveland, under its charter, possesses the same police power, in relation to any municipal affairs, that is possessed by the state, in relation to affairs of the state at large, and could pass any ordinance with respect to such municipal affairs, of the same scope and effect that a statute of the state might have, in relation to the same purpose or object, and that its authority in this regard is subject to the same constitutional limitations as the authority of the law-making bodies of the state.
*552 Certain claims, heretofore made by the relator, are, in this hearing, not urged upon the court. The case is presented to this court upon the one proposition, namely, that the ordinance in question is not a valid enactment within the police power of the city of East Cleveland.
The claim that the restrictions imposed upon the property of this relator constitute a taking of his property without due process of law, is included in the issue so stated. It has been held so frequently and so uniformly that the state may, in the lawful exercise of its police power, impose restrictions upon the use of private property, and that such restrictions do not constitute a “taking” of property, within the inhibition of the Fourteenth Amendment of the Constitution of the United States, that that question seems no longer open to discussion.. (Collection of authorities in Opinion of Justices, 103 Me., 506, 19 L. R. A. (N. S'.), 422.) Such statutes extend to and include reasonable regulations governing the location, erection and maintenance of buildings. 12 Corpus Juris, 1265, Sec. 1069.
The extent of the police power of the state has been stated by the courts, almost time without number, in almost the same language.
“The police power is an attribute of sovereignty, and has its original purpose and scope in the general welfare, or, as it is often expressed, the public safety, public health and public morals. These terms indicate its field, yet its boundaries are necessarily vague and undefinable.” Mirick v. Gims, 79 O. S., 174.
“The state is necessarily invested with a police power, which is the expression of the popular conception of the necessities of social and economical conditions, and under which may be done that which will best secure the peace, morals, health and safety of the community.” Bloomfield v. State, 86 O. S., 253.
‘ ‘ The state and municipalities may make all reasonable, necessary and appropriate provisions to promote the health, morals, peace and welfare of the community, but neither the state nor municipality may make any regulations which are unreasonable. The means adopted must be suitable to the end in view, must be impartial in operation, and not unduly oppressive upon individuals, must have a real and substantial relation to their purpose, and must not interfere with private rights beyond" the necessities of the situation.” Froelich v. Cleveland, 99 O. S., 000, syllabus 3.
*553 This ordinance, then, is not a valid exercise of the police power only (1) if it does not come within the purview of that power, .by promoting the health, morals, peace and welfare of the 'community, or (2) if it is unreasonable, arbitrary, discriminatory, and not uniform in operation.
There has been apparently no subject which has been more prolific of litigation than that involving the extent of the right of the state to limit the use of private property, under the police power. This follows naturally from the very statement of the scope of that power.
It is said to be “vague and undefinable.” 79 O. S., supra.
“It is not subject to definite limitations, but is co-extensive with the necessities of the case, and the safeguarding of public interests. ’ ’ Canfield v. U. S., 167 U. S., 518.
‘ ‘ It 'is the most essential of powers, at times the most insistent, and always one of the least limitable of the power of government.” Eubank v. Richmond, 226 U. S., 137.
The police power, being thus undefined, and the individual who, in ordinary times, will accept any limitation upon the use of his property for the general welfare, and rest content with the thought that “he is rewarded by the common benefits secured” (109 Mass., 315, 318), being very rare, the courts have been asked to pass upon the validity of each new exercise or extension of that power. No one today, I take it, would question the right of a municipality, under its police power, lawfully to limit to certain districts slaughter houses, corrals, livery stables, laundries, carpet-beating establishments, etc. Not only would we consider that there was no question that this might lawfully be done, but we would consider that there never could have been any question that it could be done. Yet the books disclose that the validity of the laws so limiting these industries were attacked in the courts upon precisely the same grounds as are urged against the ordinance here in question. The law, as laid down in those cases, is precisely the same as it is held today. The law has not changed, but the application of the law has kept pace with changed conditions, conditions' both material, and of public thought. These conditions have so changed, since it was considered the right of the state to *554 interfere with the use of private property, even to the extent of limiting its use, as a slaughter house, was debatable, that it is now held that regulations limiting the height of buildings, the material to be used in their construction, and all of the other minute limitations of building ordinances, fire district ordinances, etc., are too well established to be questioned. Welch v. Swasey, 193 Mass., 364, 373.
The development in the application of the law, in this regard, has been in sympathy with the change which has taken place generally from the conception that the law should jealously guard the right of the individual to use his property as he saw fit, subject only to the condition that he did not maintain a public nuisance thereon, to the conception that the state or community has a very definite interest in the use of private property, and that the use of such property may be very broadly limited in the interests of the community in general. As Professor Tiedeman says:
‘ ‘ In years gone by, a man was at liberty to build his house or other building as he pleased, and of what he pleased. He could imitate the example of the biblical wise man, and build it upon a rock, or, foolishly following the precedent of the foolish man, he could build it upon the sand; and no government official could interpose an objection. But this individualistic license no longer is permitted. Public opinion recognizes the indubitable fact that the builder of the house or other structure is not the only one who is interested in the character and method of its construction.” State & Federal Control of Persons & Property, Yol. II, See. 150.
It would seem that there could be no two opinions upon the proposition that the apartment house, or tenement, in a section of private residences, is a nuisance to those in its immediate vicinity. Under the evidence, and as a matter of common knowledge, of which the court may take judicial notice (16 Cye., 582), it shuts off the light and air from its neighbors, it invades their privacy, it spreads smoke and soot throughout the neighborhood. The noise of, constant deliveries is almost continuous. The fire hazard is recognized to be increased. The number of people passing in and out, render immoral practices therein more diffi *555 cult of detection and suppression. The light, air and ventilation are necessarily limited, from the nature of its construction. The danger of the spread of infectious disease is undoubtedly increased, however little, where a number of families use a common hallway, and common front and rear stairways.
The erection of one apartment house in a district of private homes would seriously affect only those persons living in the immediate vicinity thereof, but the common experience is, that the erection .of one apartment drives out the single residences "adjacent thereto, to make way for more apartments. The result is that, in time, and not a very great time, when one apartment is erected, the whole street is given over largely to apartment houses.
With the growth of its population, it appears to be practically certain that unless restricted, the greater part of East Cleveland will be built up' with apartments, and the home owners must choose either to adopt apartment life or abandon their depreciated property, and move out’ of the city or into its more remote parts. '
If the claim of the relator here is sound, a city of private homes, grass plots, trees and open spaces, with the civic pride and quality uf citizenship which is usually found in such circumstances, is powerless to protect itself against the obliteration of its private residence districts, by apartments, which shut out the sun and sky from its streets, and one another, and are generally owned by those whose greatest interest is the revenue that the building will produce. If such is the law, it must be conceded that it is unfortunate.
The apartment house is, for many, a desirable convenience," and, for some, a necessity. They are a recognized necessity in cities of any size. Their erection should not be prohibited, and under this ordinance, are not prohibited. Private residences, with yards for play spaces, with grass, trees and flowers, are necessities for people with children, and as much a convenience to the people without children, who take an old-fashioned pride in owning their homes, as is the apartment to those who are willing to accept its restrictions, for its compensatory freedom from responsibilities. It is at least equally important to the *556 community to preserve the private home for this class, as it is to provide the apartment for the first. Under this zoning ordinance, both the private home is preserved, and the apartment house is provided.
It seems eminently fair to restrict the apartment-house builder to a limited area, where his use of his property will do tbe least damage to others, and to the community. The necessities or convenience of those who live in them will be served thus with the least sacrifice of the necessities and conveniences of others. Whatever of the burdens arising from apartments there are, will be borne by those whose purposes they serve, and not shifted to the other property owners of the city, to make their property unfit for use as a home.
The burden is upon the relator to show, by clear and satisfacr tory evidence, that the ordinance does not promote the health, morals, peace or welfare of the community. The question is really one of fact, and in all of the decided cases, the conclusion reached merely records the opinion of the judges with whom the decision rests. Lachtman v. Houghton, 134 Minn., 226, 229.
In the opinion of this court, the principles so frequently enunciated by the courts, in those cases in which the validity of laws restricting the use of private property have been upheld, apply -in this case, and that the least that can be said is that it has not been shown by the relator that the ordinance is not necessary to promote the health, morals, peace or welfare of the city of East Cleveland.
It seems that there is no reported case in which the. validity of a comprehensive zoning ordinance like the one in this case, has been passed upon by any court. There are numerous cases in which, by ordinance or statute, it has been attempted to protect private residence districts. In the majority of the decisions, it is fair to say, where the law has been one, the prohibitions of which were similar to the ordinance here in question, it has been held not a valid exercise of the police power.
In the case of State, ex rel Samuel Lachtman, v. Jas. G. Houghton, 134 Minn., 226 (Nov., 1916), the court held that—
“An ordinance prohibiting the owner from erecting a store building upon land within a residential district can not be *557 sustained as a legitimate exercise of the police power, and is an unlawful invasion of the right secured to him by the Constitution. ’ ’
Of the five judges composing the court, three concurred in the decision and two dissented. The opinion of the court, written by Judge Taylor, and the dissenting opinion, by Judge Hallara, collect and review the authorities, and each opinion constitutes a complete presentation of the opposite sides of this question. Judge Taylor says, p. 237:
‘ ‘ The police power of the state is very broad, but not without limits. Under it the legislative power may impose any reasonable restrictions and may make any reasonable regulations, in respect to the use which the owner may make of his property, which tend to promote the general well-being or to secure to others that use and enjoyment of their own property to which they are lawfully entitled; but when the legislative power attempts to forbid the owner from making a use of his property which is not harmful to the public and does not interfere with the rightful use and enjoyment of their own property by others, it invades property rights secured to the owner by both the state and federal constitutions. Only such use of property as may produce injurious consequences, or infringe the lawful rights of others, can be prohibited without violating the constitutional provisions that the owner shall not be deprived of his property without due process of law nor without compensation therefor first paid or secured. That the right of a property owner to erect a store building upon his land is within the protection of these constitutional provisions, and can not be taken away under the guise of a police regulation, is so universally recognized that an extended search has failed to disclose any decision holding otherwise either in fact or in principle. We are forced to the conclusion that the ordinance in question can not be sustained in so far as it prohibits the erection of ordinary store buildings. This does not mean, however, that it is not valid in so far as it applies to structures or occupations which are within the regulatory domain of the police power.”
Judge Hallam, dissenting, says (p. 238):
“I enter upon the discussion of the question realizing that some of the views which I entertain are opposed to the greater number of decisions. This is always a consideration of importance, for decisions of courts are usually arrived at with thought *558 ful care, yet we should not overlook the fact that precedent is sometimes followed with too much obedience. It should be said, however, that there are some well considered decisions in harmony with the views here expressed, and also that the preponderance of authority the other way is not so great as would at first appear from the cases cited. Many of these cases involve only common law rights and the right of the cour.t to impose restrictions; others involve only the construction of statutes or charter provisions and decide no constitutional questions at all.
“We must take judicial notice of some of the things which everybody knows. In every city and every hamlet there are business districts and residence districts more or less distinct. They are located by certain logical laws of trade and conduct. The business district is central; the residence district, suburban. As the city grows the central business district becomes inadequate for all the city’s business needs. Accordingly, local business districts spring up, and they too are in a general way separated from the residence districts. Usually these follow lines of traction. No government has planned this separation. Without any definite plan, the intuitive efforts of the mass of people of every community has been devoted more or less consciously to maintain this separation. The fact is that people generally recognize that a business district is not the best place for a family home. The man of thrift, whether of large means or small, looks forward to a home out from the center of business activities, where he may live upon a plot of ground more or less ample in space, suitable for the bringing up of a family. The consideration is partly aesthetic, but it is in far greater measure purely practical. The prompting motives are, better light and air, better moral surroundings, and better conditions for recreation. The result is that districts spring up devoted exclusively to the building of homes.
“We are not concerned with the question whether such homes are large or small. When a city block has been devoted to the building of homes, with the incidental'breathing spaces about them, the property in the district acquires a value by reason of that exclusive use. The effect of the erection of a business structure in a residence block is well known. To an extent it changes the character of the locality from residence to business. It is a matter of common knowledge that the erection of a single grocery store, with its characteristic architecture and mode of construction and operation in a block theretofore devoted exclusively to homes, annihilates the value of residences round about. The reasons for this depreciation in value are the same as those which in the first instance prompted home owners to locate their homes away from the center of trade.
*559 “It is said this relator has a vested right guaranteed him by the constitution to damage his neighbor’s homes by devoting his lot to a use incongruous with the use of property in the vicinity, and that no power can stop him, for to stop this damage would be to take his property without due process of law. If it be said that the owner of a lot in a district of homes has the vested right to use it as he sees fit, notwithstanding the damage to his neighbor, then what of the right of his neighbor whose property value he destroys? 'Has the one a vested right to destroy and the other no right at all to be protected? In my judgment this slaughter of property value is something the legislature has power to prevent. Courts have exercised the power to abate what they have denominated nuisances at common law. This grocery store was not a nuisance at common law. But it does not follow that the legislature may not regulate the location of business structures that were not nuisances at common law. It may do so. * * *,
“In my opinion the foregoing facts furnish a justification for restriction by the state of business structures in a residence district. The fourteenth amendment has not abrogated the police power of the state. What may be done by the state under the exercise of that power without conflict with the fourteenth amendment is a federal question, upon which the federal supreme court has often spoken.”
The same court, in State, ex rel. Twin City Building & Investment Co., v. Houghton, etc., 174 N. W., 885, Oct. 24, 1919, holds:
“Condemnation can not be had for a use which is not public, and the condemnation of property against its use for an apartment 'building * * # is not a public use.”
The court divides, three to two, in the same manner as in the ease above cited, and the opinions are in conformity with those expressed in that case. This case was an action in mandamus to compel the issuance of a permit to build a three-story apartment. The majority opinion in this case is written by Dibell, J., who says (p. 886) :
“The use to which the relator purposes putting its property is legitimate. Not all people can live or wish to live in detached houses. Some from choice and some from necessity seek apartments. It is true that apartment buildings are not welcome in *560 exclusive residence districts. Their appearance is not liked. They bring more people into the neighborhood and their presence there and.their going and coming is thought by some undesirable. It is not sought to prohibit apartments, nor to prevent people living in them. It is proper enough that apartments be located elsewhere and that people live in them there, for the living conditions they offer are wholesome and the people who use them are good people. They are banned because of the environment. An apartment building does not affect the public health or public safety or general well-being so that it may be prohibited in the exercise of the police power. This we take to be the effect of our decisions.”
Judge Holt writes the dissenting opinion (p. 888):
“The legislature, in the first instance, must ascertain and determine what makes for public welfare in enacting laws designed to secure or promote the same. Courts should not lightly set aside such determination. Reference need only be made to a few of the many existing conditions which would seem to justify the law here questioned. People are crowding into cities, where the individual ownership of land is restricted to small parcels. This calls for a delicate observance and application of the rule ‘sic utere tuo ut dlienum non laedas.’ Courts often use that rule to prevent or redress an injury. And why may not the legislature do likewise when occasion arises? A person buys a 30 or 40 foot lot in a residence district and erects a modest building for a home. Later others secure two or more lots on each side of him and proceed to erect three or more story apartments or business buildings, placing the structures clear up to the lot line. Is there any doubt but that the small home first built is utterly destroyed so far as comfortable enjoyment goes and its value almost entirely obliterated? * * * It is about time that courts recognize the aesthetic as a factor in the affairs of life. "Who will dispute that the general welfare of dwellers in our congested cities is promoted, if they be allowed to have their homes in fit and harmonious or beautiful surroundings? Besides preserving and enhancing values it fosters contentment, creates a wholesome civic pride, and is productive of better citizens. City planning, by which mercantile and industrial establishments, hotels, apartments, and the individual homes are segregated, seems to me to be a public need that should invite the hearty co-operation of all the governmental departments.”
*561 To the authorities cited by the judges in these cases should be added that of Spann v. City of Dallas (1916), reported in 189 S. W. Rep., 999, in which an ordinance of the same character as that in the 134th Minn., supra, is held to be valid.
The decision of this court follows the minority opinion, being fully convinced that it is within the police power of a city to preserve districts against the apartment; that the greater the proportion of private homes in a city, preferably occupied by the owners, the better the city, in health, morals, peace and welfare.
II. Is this ordinance invalid, because it is unreasonable, orbitrary, discriminatory, and not uniform in operation? It is urged that the ordinance does not apply to all of East Cleveland, nor to all parts similarly situated; that apartment buildings are permitted within 150 to 200 feet from the property of the relator, which is restricted against them.
In 12 Corpus Juris, 1128, the law is stated (Sec. 885):
“® * * The provisions of the Fourteenth Amendment to the Federal Constitution that ‘no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws,’ have been construed to grant to all persons equality before the law, in the sense that they render void all state statutes which make any.unreasonable or arbitrary discrimination between persons or classes of persons. * # * Under the provisions of the state and national constitutions the same rules are applied as to the validity of classifications made in legislative enactments * * * and neither the fourteenth amendment nor the provisions of the state constitutions prohibiting the granting of special privileges affect the validity of state statutes making reasonable classifications of persons or things for the various purposes of legislation. If there is a reasonable ground for the classification and the law operates equally on all within the same class it is valid. And this is true even though the act confers different rights or imposes different burdens on the several classes. * * * In determining whether or not a basis of classification is reasonable, it must be looked at from the standpoint of the legislature enacting it, the question of classification being primarily for the legislature. *562 A statute will be sustained where the basis for classification made by it could have seemed reasonable to the legislature, even though such basis seems to the courts to be unreasonable. Legislative discretion in this matter is not subject to review by the courts, except to the extent of determining whether the classification adopted is arbitrary, unreasonable, and unjust. As in all the other eases involving the validity of statutes, all reasonable doubts are to be resolved in favor of upholding the validity of legislation establishing a classification; and the legislative judgment as to classification can be overthrown by the courts only when it is clearly erroneous. Classification must be reasonable and not merely arbitrary. There is no general rule by which to distinguish reasonable and lawful from unreasonable and arbitrary classification. But in order that the act may be valid the classification must rest on real differences in the subject matter having some relation to the classification made and the objects to be accomplished by the legislation, and must affect alike all persons or things within a particular class.”
It is apparently urged by the relator that this ordinance was conceived and passed only for the purpose of protecting the residents on S'tandwood and Grasmere avenue against his apartments. The evidence herein would tend to support a claim that the purchase of this property by the relator was the immediate occasion of the city taking up the question of a zoning ordinance. There appears to be no evidence, however, to substantiate the claim that the ordinance was drawn hastily and to meet only this particular case, and for the benefit of the residents of Grasmere and Stanwood streets, particularly. To the contrary, the record shows a systematic study of the conditions in the city, preliminary to the mapping out of the zones, and a careful preparation of the ordinance. It appears generally from the evidence, with particular reference to map, plaintiff’s Exhibit “B” that the zones are fairly constructed, to carry out the purposes of the ordinance. Those parts of the city already largely devoted to manufacturing, are in Zone “A”; Zone “B” embraces chiefly the main thorougfares; Zone “0,” the districts where apartments are already numerous; Zone “D” includes the territory which is either free from apartments, or in which there is but an occasional building of this character.
*563 There are instances where it might appear that some street or section, in accordance with this general plan, should have gone into one zone, rather than another, but clearly this is not for the court to determine. The divisions made by the ordinance appear to be well within the legislative discretion, and not subject to be held arbitrary or unreasonable by this court.
In every such ordinance, where territorial classification is made, as in those establishing fire limits, the line is bound tc permit to be done, on the property immediately adjacent to the line outside of the district, what is prohibited on that imme diately adjacent within the district. If this constituted an arbitrary discrimination, no territorial classification ordinance could be lawful. The point so strongly urged, that the fact that apartments are permitted within 150 to 200 feet of the relator, shows an arbitrary discrimination against him, does not appear to be well taken. The apartments permitted are on Euclid avenue, a main thoroughfare, classified in Zone “B.” Relator is upon a side street, classified in Zone “D.” If the classification is reasonable — and the court can not say it is not — -the fact that relator’s property is close to the Euclid avenue property would not alter that fact, nor show any discrimination against him.
The questions here made appear never to have been passed upon in Ohio. The one case cited, State of Ohio, etc., v. City of Cleveland, 20 O. C. C. (N. S.), 538, except that it declares the power of the court to hold an ordinance invalid which is unreasonable, is not in point. The ordinance there in question prohibited the erection of any building for working of wood * * * within 16 feet of any lot line. The court said that this meant any lot line, and concluded (p. 542) :
“It would seem to us so clearly unreasonable to say that one owning property bounded by a street, river, lake or public ground must be restricted in the erection of a building, to 16 feet from that line, that we must declare the ordinance, in so far as it provides that the building shall not be within 16 feet of a lot line, unreasonable and void.”
The general rule which must govern this court in construing *564 the ordinance is again stated in the recently reported case of Josephine E. Leis v. Cleveland Ry. Co., Ohio Law Reporter, April 19, 1920, syllabus 3:
“When a municipality, in tne exercise of the constitutional authority, has adopted local police regulations, to promote the public health and safety, every intendment is to be made in favor of the lawfulness of such regulations, and courts will not interfere except in clear cases of violation of the authority granted.”
This court is therefore of the opinion, first, that the ordinance here in question is a valid exercise of the police power by the city of East Cleveland, under the authority of its charter; second, that it has not been shown that the classifications made under this ordinance are unreasonable, arbitrary, discriminatory and not uniform in operation.
The petition of the relator therefore will be dismissed, and an exception given.