O. J. *Coogler,* contra.

---

BLACKMAN HEALTH RESORT *v.* CITY OF ATLANTA.

1. Section 729 of the code of the City of Atlanta, which provides that "it shall be unlawful for any person or persons, or corporation, to construct, erect, or build a house to be used as a private sanitarium, hospital or boarding-house, or other house of like character, wherein patients are kept, and medical or surgical treatment is given or performed," except in the manner therein provided, is within the police power delegated to the municipality, as provided by section five of the act of the General Assembly approved Dec. 2, 1901 (Acts 1901 p. 312), amending the charter of the City of Atlanta, whereby power is given to the mayor and general council "to control, regulate, and in its discretion prohibit the erection and maintenance of sanitariums, boarding-houses, and other similar places in residence portions of the city."

2. A building alleged to be used as a "tourist and health resort" is prima facie included in that class described as "a house to be used as a private sanitarium, hospital or boarding-house or other house of like character, wherein patients are kept and medical or surgical treat-ment is given," as employed in section 729 of the code of the City of Atlanta.

3. An act of the legislature, in general terms conferring power to con-trol, regulate, and in its discretion prohibit the erection of buildings of the character mentioned in the first note, "without prescribing the bounds of such discretion, will not ipso facto render the grant of power void as being an effort to confer arbitrary power, but will be treated as authorizing the municipal authorities to exercise a rea-sonable discretion."

4. The ordinance of the city of Atlanta (city code, § 729), construed as authorizing the mayor and city council, under the police power con-ferred by the General Assembly, to exercise a reasonable discretion in permitting or refusing to permit the erection of the building sought by the petitioner, is not violative of the fourteenth amendment to the constitution of the United States (Civil Code, § 6700), which guar-antees due process and equal protection of the law; nor is it viola-tive of the due-process clause of the constitution of this State, art. 1, sec. 1, par. 3 (Civil Code, § 6359).

5. An arbitrary or capricious exercise of such power would be an abuse of discretion and in conflict with the fourteenth amendment to the constitution of the United States, and also in conflict with the clause of the constitution of this State which declares that no person shall be deprived of life, liberty, or property without due process of law. In any such case the injured party may resort to the courts for re-lief. Freund on Police Power, §§ 142, 158.

6. It is settled that the powers of a municipal corporation in this State are limited to those expressly granted by the General Assembly or conferred by necessary implication. *Frank* v. *Atlanta*, 72 *Ga.* 428 (1-b); *Peginis* v. *Atlanta*, 132 *Ga.* 302, 304 (63 S. E. 857, 35 L. R. A. (N. S.) 716).

7. The allegations of the petition. accepted as true when considered on general demurrer, set out a cause of action showing an abuse of dis-cretion on the part of the mayor and council in refusing to issue the permit sought by the petitioner. It was error, therefore, to sustain the general demurrer to the petition. The judgment dismissing the petition affords no basis for a ruling by this court on the special de-murrer.

No. 2185.    MAY 13, 1921.

Petition for mandamus. Before Judge Pendleton. Fulton supe-rior court. July 16, 1920.

Blackman Health Resort Incorporated filed a petition alleging that it had, in pursuance of the purpose for which it was incor-porated, acquired valuable property on Piedmont Avenue adja-cent to Piedmont Park in the City of Atlanta, and was proposing to erect thereon a building to be used as a "tourist and health resort;" that, as required by the charter of the City of Atlanta and for the purpose of procuring permission to erect said build-

ing, it submitted to the inspector of buildings of said city the plans and specifications of the proposed structure, together with a statement of the purpose for which the same was to be used; and that said inspector construed said application to be one for permission to erect a sanitarium, and as falling within the ordinance incorporated in section 729 of the code of the City of Atlanta, viz.: "It shall be unlawful for any person or persons, or corporation, to construct, erect, or build a house to be used as a private sanitarium, hospital or boarding-house, or other house of like character, wherein patients are kept, and medical or surgical treatment is given or performed, except in the following manner: The applicant shall file with the building inspector, in writing, a request for a permit to build, which shall plainly set forth the character of the building, and for what purpose it is to be used; if no objections thereto be filed within twenty-four hours, the same shall be granted; if objections in writing are filed by adjacent property owners or near neighbors, within the time above specified, the application and objections thereto shall be transmitted to the mayor and general council, and a hearing and judgment had thereon; and the permit shall not be granted by said building inspector until directed so to do by the mayor and general council after hearing the applicant and the objectors." It was alleged, further, that objection to the granting of the permit was made upon the grounds: that the proposed building would be located within one hundred and fifteen steps of the entrance to Piedmont Park, and would make of the park an annex for crippled and deformed persons; that blood-disease patients from said building would use and pollute the swimming-pool in the park; that to grant the permit would establish a precedent and render it necessary to permit other hospitals to be located near the park; that the proximity of the park to said building would be used as an advertising feature; that to permit the erection of the building would commercialize the park; that children would be kept away from the park, because of the nearness of invalids and convalescents; that to permit the erection of the building would cause crippled, deformed, and diseased people to be near the Tenth Street public school, which is situated across the street from and within two hundred feet of the site of the proposed building, and would encourage the location of sanitariums near other schools; that twelve real-estate

men and the real-estate boards of nineteen other cities had expressed the unsworn opinion that the erection of the building would cause adjacent property to depreciate in value and render it less desirable; that the board of education and parent-teacher's association were opposed to the erection of the building; that 127 owners of property in the immediate neighborhood were opposed to the granting of the permit; that no sanitarium town ever exceeded 50,000 people, and no city known as a health resort ever becomes an up-to-date city; and that sanitariums do not aid in the effort to establish a city with a population of five hundred thousand. Upon consideration of the matter the mayor and general council of the city denied to petitioner the right to erect said building. It was alleged that said action was arbitrary and capricious and without any legal basis or reason; that petitioner did not contemplate the erection or operation of a house of the kind covered by said ordinance; that the action of the mayor and council had the effect of depriving petitioner of its property without due process of law, and of equal protection of the laws, in violation of the provisions of the State and Federal constitutions as set out in sections 6359 and 6700 of the Civil Code of Georgia; that, if permitted to stand, the action of the mayor and council would result in a total loss of the amounts expended by petitioner in the purchase of its real estate and the preparation of plans and specifications. It prayed that the city, the mayor and general council, and the inspector of buildings be compelled by the writ of mandamus to grant to it permission to erect said building. The petition was dismissed on general demurrer, and error is assigned upon that judgment.

*Colquitt & Conyers,* for plaintiff.

*J. L. Mayson, J. M. Wood,* and *W. A. Fuller,* for defendants.

GILBERT, J. It is not deemed necessary to discuss the rulings in any of the headnotes, except the last, which relates to the sufficiency of the petition to set out a cause of action. The lot of petitioner, which it desires to improve, is private property, and both the State and Federal constitutions afford ample protection so long as it does not affect injuriously the public welfare. Indeed, the constitution of this State declares: " Protection to person and property is the paramount duty of government and shall be impartial and complete." Under the police power the State has

undoubted constitutional power to protect the public health and morals from improper use of private property. Numerous cases are found in which nuisances are dealt with under the police power, but the exercise of such power is not restricted to instances where a nuisance already exists. The authority of the State itself, or as delegated to a municipality, whether it be to abate nuisances or to prohibit or regulate anything on the ground that it injuriously affects public health and morals, is based alone on the police power. " In abating nuisances the public does not exercise the power of eminent domain, but the police power." *Dunbar* v. *Augusta,* 90 *Ga.* 390, 395 (17 S. E. 907) ; Patterson v. Kentucky, 97 U. S. 501 (24 L. ed. 1115). As stated by Mr. Freund in his work on Police Power, 25, § 29, " The common law of nuisance deals with nearly all the more serious or flagrant violations of the interests which the police power protects, but it deals with evils only after they have come into existence, and it leaves the determination of what is evil very largely to the particular circumstances of each case. The police power endeavors to prevent evil by checking the tendency toward it, and it seeks to place a margin of safety between that which is permitted and that which is sure to lead to injury or loss. This can be accomplished to some extent by establishing positive standards and limitations which must be observed, although to step beyond them would not necessarily create a nuisance at common law. This policy finds expression in standards of purity of food and of other commodities, in building regulations, safety and health requirements for factories, ships, and mines, in the creation of districts for offensive establishments, in the limitation of hours of labor, and in tariffs of charges." Among the objections urged against the petition was that the property upon which it was proposed to erect the health resort was only one hundred and fifteen steps from the entrance to Piedmont Park ; that Piedmont Park would become an annex for crippled and deformed persons ; that blood-disease patients in petitioner's building would use and pollute the swimming-pool in the park ; that other hospitals would have to be allowed near the park ; that children would be kept away from the park by parents on account of the nearness of invalids and convalescents in the building of petitioner ; and that the health resort would commercialize the park. It would seem that public parks of a city are intended

for the free use of sick persons, cripples, invalids, and convalescents, as well as persons enjoying perfect health, children and their nurses. So far as we are aware it has never been suggested that any one or more of these classes can be arbitrarily prohibited the use of a public park directly or indirectly, or that their presence is unwelcome. 20 R. C. L. 650, § 16. Indeed we are of the opinion that a public park is intended primarily for the purpose of benefiting the public health by affording abundance of pure air to those lacking in health, as well as for preserving health. That those having blood disease may pollute the waters affords ample reason for providing reasonable regulations for the privilege of swimming in the lake; but such regulations would seem to be just as imperative to prevent such dangers from diseased persons not patients at the proposed resort or in any hospital elsewhere. In 2 Dillon on Municipal Corporations, § 695, the author says: "Of recent years, in response to a growing demand for the preservation of natural beauty and the conservation of the amenities of the neighborhood resulting from the manner in which it has been laid out and built upon, legislatures and municipalities have sought, by statute and by ordinance, to prevent the encroachment of undesirable features, unsightly erections, and obnoxious trades. This legislation, induced mainly by æsthetic considerations, has given rise to a series of novel questions affecting the legislative power of both the State and its governmental agent, the city. It has been held that, for æsthetic considerations and to promote the popular enjoyment and advantages derived from the maintenance of a public park, the legislature may, by virtue of the power of eminent domain and upon making just compensation, impose restrictions upon the manner in which property abutting on the park may be improved and used. But it is apparent that restrictions founded not upon the power of eminent domain, but upon the exercise of the police power, stand upon another basis; and several cases have laid down the rule that by virtue of the police power merely, neither the legislature nor the city council exercising delegated power to legislate by ordinance can impose restrictions upon the use of private property which are induced solely by æsthetic considerations, and have no relation to the health, safety, convenience, comfort or welfare of the city and its inhabitants. The law on this point is undergoing development, and perhaps

cannot be said to be conclusively settled as to the extent of the police power." See 6 R. C. L. 213, 214. The Supreme Court of Massachusetts, in Attorney-General v. Williams, 174 Mass. 476 (55 N. E. 77, 47 L. R. A. 314), sustained the constitutionality of a statute limiting the height of buildings fronting on Copley Square, Boston, an open square and a public park surrounded by buildings devoted to religious, charitable, and educational purposes, on the ground that the act provided compensation to persons injured in their property by the limitation which it created. In the opinion it was said: " The grounds on which public parks are desired are various. They are to be enjoyed by the people who use them. They are expected to minister, not only to the grosser senses, but also to the love of the beautiful in nature. Their influence should be uplifting and in the highest sense educational. If wisely planned and properly cared for, they promote the mental as well as the physical health of the people." It was argued that the legislature, in passing this statute, was seeking to preserve the architectural symmetry of Copley Square. In regard to this the court said: If this is a fact, and if the statute is merely for the benefit of individual property owners, the purpose does not justify the taking of a right in land against the will of the owner. But if the legislature, for the benefit of the public, was seeking to promote the beauty and attractiveness of a public park in the capital of the Commonwealth, and to prevent unreasonable encroachments upon the light and air which it had previously received, we cannot say that the lawmaking power might not determine that this was a matter of such public interest as to call for an expenditure of public money, and to justify the taking of private property." The decision of the Supreme Court of Massachusetts was upheld by the Supreme Court of the United States, on the ground that the statute provided a direct and appropriate means of ascertaining and enforcing payment of the damages resulting from the taking. Williams v. Parker, 188 U. S. 491 (23 Sup. Ct. 440, 47 L. ed. 559). Another objection raised was, that, in the opinion of a number of real-estate agents or " realtors," the location of a " tourist and health resort " at the place proposed would damage the adjacent property and injuriously affect its desirability as residence property, as well as its market value. In a case brought to enjoin a nuisance caused by smoke it

was said: " Every one has the right to use his property as he sees fit, provided that in so doing he does not invade the rights of others unreasonably, judged by the ordinary standards of life and according to the notions of reasonable men. The right to use one's property as he pleases implies a like right in every other person; and it is qualified by the doctrine that the use in the first instance must be a reasonable one. The maxim is sic utere tuo ut alienum non lædas. . . That the business itself is offensive to others, or that property in the neighborhood of such business is necessarily adversely affected thereby, or that persons of fastidious taste would prefer its removal, is not sufficient. Applying the foregoing principles to the case in hand, the defendant may make any use of its property, and carry on any business not per se a nuisance that produces no unnecessary, unreasonable, unusual, or extraordinary impregnation of the air with smoke or soot, to the sensible inconvenience and discomfort of plaintiff's tenants, or to the actual, tangible, and substantial injury of plaintiff's realty." *Holman* v. *Athens Empire Laundry Co.,* 149 *Ga.* 350, 351 (100 S. E. 207, 60 A. L. R. 1564). " Hospitals, whether for the insane or for other persons, and although they are of a strictly private or of a private eleemosynary character, are not nuisances per se, but they may become so by reason of careless management." 13 R. C. L. 951, § 16. " A hospital is not a nuisance per se, or even prima facie; but it may be so located and conducted as to be a nuisance to people living close to it. Even a pesthouse is not a nuisance per se, although it may be a nuisance where it is . . situated near to property used or suitable for residence purposes." 29 Cyc. 1175; Stotler v. Rochelle, 29 L. R. A. (N. S.) 49 (83 Kan. 86, 109 Pac. 788). It has been held by this court that a private stable is not a nuisance per se (*Rounsaville* v. *Kolheim,* 68 *Ga.* 668, 45 Am. R. 505); and the same has been held in regard to a jail (*Bacon* v. *Walker,* 77 *Ga.* 336), and a powder magazine (*Simpson* v. *DuPont Powder Co.,* 143 *Ga.* 465, 85 S. E. 344, L. R. A. 1915E, 430). It has been held by this court that lodging-houses, hotels, butcher-shops, and the like are not harmful per se. *Peginis* v. *Atlanta,* 132 *Ga.* 302 (63 S. E. 857, 35 L. R. A. (N. S.) 716); *Cutsinger* v. *Atlanta,* 142 *Ga.* 555, 566 (83 S. E. 263, L. R. A. 1915B, 1097, Ann. Cas. 1916C, 280); *Eisfeldt* v. *Atlanta,* 148 *Ga.* 828, 830 (98 S. E. 495). It has also been held

that the operation of a cotton-gin is not per se a nuisance, but it may become so under certain circumstances. *Tate* v. *Mull*, 147 *Ga.* 195, 197 (93 S. E. 212, 3 A. L. R. 310). In the case of *City of Quitman* v. *Underwood*, 148 *Ga.* 152 (96 S. E. 178), which was a proceeding to enjoin the construction of a crematory, this court said: "Generally equity will not enjoin the construction of a building not in itself a nuisance, but the person erecting the building will proceed at his peril, the whole subject being for the jury on the trial. *Mygatt* v. *Goetchius,* 20 *Ga.* 350; *Cunningham* v. *Rice,* 28 *Ga.* 30, 32. Where the business itself is legal, it only becomes a nuisance when conducted in an illegal manner to the hurt, inconvenience, or damage of another." We think it obvious that a "tourist and health resort," as described in the petition, not only is not per se harmful to public health and morals, but, when properly located and conducted, is legitimate, beneficial, and humanitarian. Notwithstanding the fact that the business is not per se injurious to public health and morals, it belongs, as we have held in the syllabus, to that class included within the control of the police power of the State. *Union Dry Goods Co.* v. *Georgia Public Service Corporation,* 142 *Ga.* 841 (2-a), 844 (83 S. E. 946, L. R. A. 1916E, 358); 6 R. C. L. 198, 200 et seq. The police power cannot be surrendered or abandoned by the legislature. *Barbour* v. *State,* 146 *Ga.* 667 (92 S. E. 70, 2 A. L. R. 1095); Stone *v.* Mississippi, 101 U. S. 814, 817, 818 (25 L. ed. 1079); 1 Clute on Modern Municipal Charters, 152, § 70 et seq., and notes; 6 R. C. L. 189, § 189. For a discussion of these classes or groups, see *Cutsinger* v. *Atlanta,* supra; Lieberman *v.* Van De Carr, 199 U. S. 552 (26 Sup. Ct. 144, 50 L. ed. 305). Some classes of businesses and occupations are per se injurious to public health and morals, and, under the police power, may be altogether prohibited. The one most frequently before the courts is that concerning intoxicating liquor (*Cutsinger* v. *Atlanta,* supra), which stands, by universal consent, in a class peculiarly within the police power. *Cassidy* v. *Wiley,* 141 *Ga.* 340 (80 S. E. 1046, 51 L. R. A. (N. S.) 128). *Barbour* v. *State,* supra.

We have thus far shown that the petitioner sought from the City of Atlanta a permit to erect a building of a class not per se harmful, but over which the municipal authorities may exercise reasonable discretion and supervision to prevent it from becoming

a nuisance to the public. *Giles* v. *Rawlings,* 148 *Ga.* 575 (97 S. E. 521). It would be an arbitrary and illegal exercise of power to decline the permit, unless it were shown that the building is injurious to health and morals. The defendants, as the case stands at present, do not deny any of the allegations of the peti- tion, but content themselves with interposing a demurrer, which of course admits all of the facts well pleaded. In view of the length already attained by this discussion it is not deemed profitable or desirable to discuss in detail the remaining objections set out in the petition. It is sufficient to say that they are similar in charac- ter to those already discussed, or purely matters of opinion and speculation. For the reasons stated, and as we view the law and the facts alleged, the judgment dismissing the petition on general demurrer was erroneous. The only case relied upon by the de- fendant in error, apparently in conflict with the views which we have expressed, is Commonwealth *v.* Charity Hospital, 198 Pa. 270 (47 Atl. 980). In that case the constitutionality of a statute of the Pennsylvania legislature, " declaring it unlawful hereafter to establish or maintain any additional hospital in the built-up por- tions of cities," was brought in question. This was not a delega- tion by the legislature of the State to a municipality or to a board to determine whether or not the establishing or maintaining of a hospital or hospitals was injurious to the public health and morals. Upon the contrary it was a declaration by the State under its sovereign power to declare what was injurious. There is quite a difference between the exercise of police power by a State and the delegation of that power to be exercised by some board or subdivi- sion of the State. Where there is a delegation of power, it has been uniformly held that its exercise must be reasonable and not arbitrary and capricious. *Purvis* v. *Ocilla,* 149 *Ga.* 771 (102 S. E. 241). The Pennsylvania act was not a local, but a general act, for the protection of public health throughout the State. The constitutionality of this act was upheld. The opinion cited in the brief of the defendant in error was written by the trial judge, and was included in the report of the case in the Supreme Court of Pennsylvania, which rendered an exceedingly brief per curiam opinion, that court being content to rule: " The evidence submit- ted by the contending parties to the issue framed by bill and an- swer was carefully scrutinized and considered by the learned judge

of the court below, and the result of it appears in his findings of fact and conclusions of law. An examination of these, of the testimony submitted as above stated, and of the law applicable to the case has failed to convince us of error in the decree, or·in the findings of fact or conclusions of law on which it is based."

*Judgment reversed. All the Justices concur, except*

BECK, P. J., and ATKINSON, J., who dissent from the ruling in the seventh headnote.

FISH, C. J., concurs in the judgment.