### 17672. FAIRVIEW CEMETERY CO. v. WOOD et al.

1. Where a person "as trustee for a corporation in process of charter, to be known as Fairview Cemetery Company," applied to the Board of Commissioners of Roads and Revenue of Fulton county, Georgia, "for a permit for himself as trustee for the benefit of said corporation, when chartered, to establish a cemetery for the burial of colored people in Fulton county, Georgia, more than 4 miles from the center of the city of Atlanta," upon certain described property situated outside the limits of any incorporated town or city, and such Board of Commissioners of Roads and Revenues, acting under the provisions of the act of the General Assembly of this State, approved August 9, 1910 (Ga. L. 1910, 130; Park's Code, §§ 1676nn-1676qq), granted the permission as applied for, and where such proposed corporation on being thereafter organized acquired the property referred to, it was not essential to its use and enjoyment of the permission to establish such cemetery that the person by whom such permission was obtained should make an assignment of the same to the corporation.

---

Cemeteries, 11 C. J. p. 52, n. 35 New; p. 53, n. 42 New; p. 56, n. 15 New; p. 57, n. 24.

Constitutional Law, 12 C. J. p. 839, n. 71; p. 911, n. 53; p. 912, n. 57.

Nuisances, 29 Cyc. p. 1222, n. 42, 43; p. 1247, n. 48.

2. Where, under the provisions of the act of 1910, referred to above, the proper county authorities granted permission for the establishment of a cemetery located as prescribed in the statute, and where the person to whom the permission was granted or one succeeding thereto had, on the faith thereof, expended large sums of money in purchasing property to be used as such cemetery and in improving the same for such use, and had incurred other expenses and liabilities in the expectation of using and enjoying the permission so granted, a resolution thereafter adopted by such county authorities, for the purpose of rescinding their previous action in making the grant, was void and of no effect, where its adoption was without a hearing and without any sort of notice to the person to be adversely affected, where also there was nothing to show that any of the conditions of such permission had been violated.

3. The remedy provided by section 5329 of the Civil Code (1910) et seq. is available for the abatement only of an existing nuisance, as distinguished from what may, but has not yet, become a nuisance.

4. There was no basis for declaring the cemetery to be a nuisance, in any of the evidence with respect to obtaining or the failure to obtain burial permits. Nor was there any other evidence to support the verdict and judgment in favor of complainants. The superior court erred in refusing the certiorari.

Decided April 16, 1927.

Certiorari; from Fulton superior court—Judge Hutcheson presiding. September 6, 1926.

*Colquitt & Conyers, Paul S. Etheridge, H. A. Etheridge,* for plaintiffs in error.

*Key, McClelland & McClelland,* contra.

Bell, J. This case is virtually controlled by the decision of the Supreme Court in *Hallman* v. *Atlanta Child's Home,* 161 *Ga.* 247 (130 S. E. 814). The subject-matter is the same and two of the three complainants here were among the intervening plaintiffs there. The beginning of this case followed closely upon the ending of that case, being predicated upon the same facts, with others in the meantime occurring. We make reference to the facts shown in connection with the Supreme Court's decision without repeating them. The litigation is about the establishment of a cemetery, to be known as Lincoln Memorial Park. The permission for the establishment of the same was issued to Hallman "as trustee for a corporation in process of charter, to be known as Fairview Cemetery Company, for a permit for himself as trustee for the benefit of said corporation when chartered to establish a cemetery for burial of colored people in Fulton county, Georgia, more than four miles from the center of the city of Atlanta," upon land described. After Fairview Cemetery Company was chartered and

organized, it acquired from Hallman the property referred to. There was no effort by Hallman to make any express transfer or assignment to the company of the permission to establish the cemetery, which had been granted to him by the county authorities. The decision in the *Hallman* case, supra, was rendered by the Supreme Court on November 13, 1925. On December 2, 1925, the Board of Commissioners of Roads and Revenues of Fulton county adopted a resolution purporting to revoke and rescind the permission which it had previously granted to Hallman. Meanwhile the cemetery company spent large sums of money in the purchase of the location for the cemetery and in improving the grounds and incurred other expenses and liabilities on the faith of the original permit which it was intending to exercise, and which it undertook to exercise upon the final determination of the *Hallman* case. Such revocation of the permit was without notice to Hallman or to the cemetery company, or to any one to be adversely affected thereby. The first burial in the proposed cemetery occurred on December 10, 1925. As many as ten interments were made during the month. Thereafter, during the same month, the present case was instituted. It was commenced by an application to justices of the peace of the district in which the cemetery is located, praying for the abatement of the cemetery as a nuisance, the procedure adopted being that provided for by the Civil Code (1910), § 5329 et seq. After a verdict and judgment in favor of the complainants to the effect that the cemetery should be abated, the cemetery company carried the case, by certiorari, to the superior court. The certiorari was overruled and the company excepted.

In our view of the case certain assignments of error, contained in the petition for certiorari and insisted upon by counsel for the plaintiff in error in their brief, may be passed over without decision. A number of them appear not to have been verified by the magistrates and we doubt if this defect was cured by the agreement of counsel recited in an order of the superior court appearing in the record. At any rate, the rulings which we think must be made on the merits will sufficiently dispose of the case.

1. The first question for determination is whether the permission which the county authorities granted to Hallman, as trustee, could be exercised and enjoyed by the Fairview Cemetery Com-

pany under the facts stated. The point is made by counsel for the defendants in error that this permit was granted to Hallman and not to the cemetery company and that, even if it might be used by one other than Hallman, it could not be used in the absence of some transfer or assignment by him, none having been made. It appears from the record that the Board of Roads and Revenue of Fulton county, at a session held on December 26, 1924, "granted a petition filed by T. A. Hallman, as trustee for a corporation in process of charter, to be known as Fairview Cemetery Company, for a permit for himself as trustee for the benefit of said corporation, when chartered, to establish a cemetery for burial of colored people in Fulton county, Georgia, more than four miles from the center of the city of Atlanta," upon certain described property. This is recited in the order of December 2, 1925, passed for the purpose of revoking and rescinding the previous grant of the application. The original order is not shown in the record. We think it clear from the language just quoted that the permit which was granted to Hallman was intended for the benefit of the corporation, and that it could be enjoyed by the corporation, when chartered and organized, as fully as though it had been issued to it directly. This is, to our minds, the plain meaning of the language used, and accordingly we hold that when the Fairview Cemetery Company became duly chartered and organized as a corporation and acquired the property described in the permit, it was entitled to proceed to act under the permit granted to Hallman as trustee, without further authority from the Board of Commissioners and without any express transfer or assignment of the permit by Hallman.

2. The next question for consideration is whether the Board of Commissioners had authority to pass the order of December 2, 1925, revoking and rescinding their action of December 26, 1924, granting the permit to Hallman as trustee as above stated. The board, in granting such permission, was acting under the authority of the act of 1910 (Ga. L., 1910, 130; Park's Code, § 1676nn-1676qq), as to which statute the Supreme Court, in the *Hallman* case, said, "It does not empower the commissioners to revoke the power once granted." This, however, was merely to say that the act contained no provisions for revocation, and was not to hold that the permit once granted was irrevocable. It may be that

the permit could be revoked under the general law if facts subsequently occurring should require such action, although this question does not arise for decision under the present record. Counsel for the defendants in error advance the argument that the permit was granted in the exercise of the State's police power and this is the strongest point that can be made in favor of its revocability. The police power of the State can not be surrendered and the governing authorities can not be estopped to perform the necessary and proper functions enjoined thereby. However, assuming, without deciding, that the legislature, in passing the act of 1910, intended that the authority therein conferred on the Board of Commissioners' should be exercised under the State's police power, it is nevertheless the rule "that an arbitrary and capricious exercise of such power would be an abuse of such discretion," in conflict with provisions of the State and Federal constitutions. *Dobbins* v. *Los Angeles*, 195 U. S. 223 (25 Sup. Ct. 18, 49 L. ed. 169); *Blackman Health Resort* v. *Atlanta*, 151 Ga. 507 (5) (107 S. E. 525, 17 A. L. R. 516). In the present record it appears that the Fairview Cemetery Company, on becoming chartered and organized, expended large sums of money for the purpose of acquiring the property upon which the proposed cemetery was to be located, and in improving the same for such use, and also made other contracts and incurred other obligations on the faith of the permit which had been granted by the county authorities for the establishment of such cemetery, and on the expectation of using and enjoying such permit. At the time of the revocation thereof, no burial had been made in the cemetery. So far as appears, none of the terms or conditions, either express or implied, of the permit as granted had been violated. The revocation of the permit was without notice to Hallman, the cemetery company, or other person to be affected thereby. The Supreme Court, in the *Hallman* case, held in effect that this particular cemetery was not a nuisance per se; and ruled that an injunction against the establishment of the same was contrary to law and equity, in view of the permit that had been granted therefor by the board of commissioners. The facts bearing upon the question whether the cemetery was a nuisance, as they appeared in that case, were unchanged when the board, on December 2, 1925, undertook to revoke the permit previously granted. If, in the meantime, the ceme-

tery had not become a nuisance, the board acted without the scope of its authority where, on the faith of the permit, and before the revocation, the party to whom it was granted, or one rightfully succeeding thereto, had made investments and had otherwise expended money on the faith and expectation of exercising and enjoying the privilege theretofore granted. Such is this case,—not to mention the want of notice and hearing, the resolution of December 2, 1925, having been passed without a hearing and without any notice to the person or persons to be adversely affected thereby. The giving of such notice and hearing, however, would hardly have helped the matter under the facts appearing; although there may be instances of a public danger so grave and at the same time so immediate as to justify the omission to give notice and hearing before taking action against the same under the police power. State *v.* Del Rio Turnpike Co., 131 Tenn. 600 (175 S. W. 1143) ; Phillips *v.* Lewis, 3 Shannon's cases (Tenn.), 230; Lakeview *v.* Rose Hill Cemetery, 70 Ill. 191 (22 Am. R. 71) ; Villa Park *v.* Wanderer's Rest Cemetery, 316 Ill. 226 (147 N. E. 104). If we are. correct in this statement of general principles, the county authorities could not properly have revoked the permit even if notice and hearing had been given, but we need not go that far in our ruling, since it is a fact that the board's action was without any notice or hearing whatsoever. The ruling which we actually make upon this point is as stated in the headnote.

3. From what has been said above, our subsequent consideration of the case must proceed upon the theory that the original permit to establish the cemetery as granted on December 26, 1924, continued of .force, unaffected by the attempted revocation of December 2, 1925. We have seen that nothing had occurred to render the cemetery a nuisance on or prior to the last named date. The question next to be determined will depend upon whether any such occurred between that date and the filing of the application with the justices for the abatement, in the latter part of December, 1925. The mere grant of the permit to establish the cemetery would not preclude its abatement if it was so conducted as to become a nuisance in fact. The act of 1910 provides that a cemetery established without such permit shall be subject to abatement as a nuisance and that it may be abated as such also where there has been a violation of the conditions or regulations pre-

scribed by the Board of Commissioners in making the grant. These provisions, however, were evidently not intended to be exhaustive of the facts and circumstances under which a cemetery may be adjudged to be a nuisance. Coming now to a consideration of the evidence introduced for the purpose of showing that the cemetery was so maintained as to become a nuisance in fact, there was some evidence to the effect that water might seep from some of the graves in this cemetery into a certain branch from which some of the complainants obtained water for use in the household, and from which some of their stock were watered. We will quote from the record all the evidence relating to this issue. A. G. Allen, one of the complainants, testified as follows:

"The cemetery property where they are burying now drains on my property, all the way across it. Mrs. McDaniel's property joins mine. It drains toward her also. I get water from that stream that runs through my property. I don't think Mrs. McDaniel gets her water there. I get drinking water from that stream. I get water for my live stock and chickens. All the drainage runs into it. It goes right through my place. This branch runs within about 225 feet of where burials have taken place. A part of the cemetery property drains in the other direction. That stream runs all the year. It is not surface water. It comes from the spring. I have not been to the head of the spring, but from hearsay, I would say it is about a half mile from where these burials take place. The branch that runs from the spring passes within about 225 feet of the cemetery property, where the burials now take place." Mrs. Minnie L. McDaniel testified: "I have six acres, more or less, that borders on the cemetery tract. There is a stream of water that runs through my place. It comes out from Mr. Wood and Mr. Baird. It comes from towards Mr. Wood and goes right on by. The cemetery property comes right up to that branch. It may be two or three hundred feet from where they are now burying, but when they come right to my place and commence burying, it will be right in my spring where I use water. If they put them right next to the branch, it will be right on me, and I use drinking water and water for my horse and cow, and everything. I have to drink water out of that branch. My well went dry. My spring runs into the branch. . . Yes, sir, I am on the north side of the branch

across the stream from where the cemetery is. My spring is on the north side of the branch, but I have to drink water out of that branch. Yes, sir, I am on the opposite side of the main stream from the cemetery. My house is on the same side as the spring."

Dr. W. H. Henderson testified: "I am a practicing physician, and practice in Center Hill section a good deal. I am not familiar with where the cemetery is located, but I know about where it is. I know Mrs. McDaniel. As to what effect a cemetery bordering close on a stream within 100 or 200 feet of a stream out of which people and cattle drink, it is owing to the lay of the land. If the strata of rock or clay is dipping toward the spring, the seepage from the graves is likely to get to the spring. In this country we have a lot of limestone and there are crevices and in the clay there are crevices, and the water naturally forms a small stream as it flows into the ground, and it is likely to carry anything that gets in to the spring into the stream. The seepage from the ground is what makes the spring. Where the graves are within 100 or 200 feet it is probable that infection will get into the water. The fact that the water runs through the ground and in that direction shows that the cleavage must be that way, and the water follows the cleavage. Naturally water in the ground seeps or circulates as blood in the veins does in the body. It possibly might affect the health of the people who use that stream. I don't know anything about the formation and structure of the soil there. I don't know in what direction the strata runs. I don't suppose anybody else does. My opinion is just a general opinion as to what might happen in a general case."

Dr. E. L. Awtrey testified: "I am a practicing physician and occasionally get a call out here at Center Hill." Question: "Doctor, I will ask you whether burials within one hundred or two hundred feet of a live spring or branch out of which people and cattle use water, and that this is not a surface stream, it runs all the year around, I will get you to state whether or not it is probable that infection will come from burials made that close to a vigorous running stream." The witness proceeded: "The feeding of the spring is due to the seepage through the earth. It collects in the grass and leaves and substrata and gradually seeps into the earth, and it is a fact that we have a great deal of limestone in this section, and there might be crevices and it might

get into larger passages. Frequently in digging in wells, I have had one dug, there would be a large stream, half as large as your arm, that would pour into the well and the well-digger would hardly have time to get out of the way, and if it directly connected with the graves and half decomposed bodies and piled into a hole after the usual form of embalming and disinfecting, and put into a casket, it would contaminate the earth and I wouldn't drink water out of it under any circumstances. Bodies that have been disinterred and piled into a hole might contaminate the water in the ground. I believe it would and I wouldn't allow any cattle or animal on my place to drink the water. I don't know anything about the formation there. I have not studied it. I don't know whether the drainage from the cemetery is toward the spring or not. I do not know that the underground or percolating waters from this cemetery go in the direction of that branch or that spring."

P. E. Wood testified: "I am son of Judge Wood. I am familiar with the lay of the land where the cemetery is. You take on the north side, it is a kind of steep hill. It is on a decline. You might say the grave is 100 feet higher than the stream, and when it rains the water seeps into the ground and runs out to a wet water stream. I know there is a wet bank ten feet deep and a wet weather spring will run for two or three days, and if it comes two or three days of rain it seeps all the time. That is on the north side, and on the south side there is a stream that joins this stream that runs on the north side and there is a living spring in 200 feet of where they buried the last body, and that runs in 400 feet from where that living stream runs into the main stream, and it collects on five acres and the water drains into this wet weather spring. In dry weather you have a live stream all the time. That is not the spring that Mrs. McDaniel testified about. It is beyond the one she testified about. The spring is in Mr. Hood's land, and comes down 300 feet to Mrs. McDaniel and leaves her land and goes through Mr. Allen's land. It runs in the spring on Simpson street and joins Mr. Allen's stream half a mile below. One third of the cemetery drains toward the spring, that comes into Mr. Allen's place, and two thirds drain toward the south into the stream that joins Mr. Allen's stream. The cemetery company owns this last stream. Yes, sir, I know about the underground

formation. I have been down in it 50 feet on the cemetery property about the middle of the property where they are burying. I went down into a well to get a rooster that had jumped in. No, sir, I didn't dig the well, but I saw the rocks laced together. They pitch toward the Alligator [Allegheny] mountains. The strata runs a little bit north and up. It runs a little northeast and pitches toward the north. It is a gray rock, you might call it soft granite. It is not hard granite. Between the rocks lies yellow fine dirt and rock. If you go down 10 feet it is red dirt. The next is yellow clay, and white and sandy until you get to hard sand. Below that a little piece I have been down 10 or 15 feet, it is a kind of white clay. It will wash out quickly. On top of the hill is where the red clay is. It changes as it goes toward the branch. The dirt gets whiter down there."

It will be noted that the branch in which it is claimed the water is or will be contaminated was not closer than 225 feet to the nearest grave, while the testimony of each of the physicians was on the hypothesis that the graves were situated within 100 to 200 feet of the branch. We think the evidence is too vague, uncertain, and conjectural to show any actual present contamination of the water, the evidence upon this question establishing nothing more than a mere possibility of such condition. In *Harper* v. *Nashville*, 136 *Ga*. 141 (70 S. E. 1102), quoted in the *Hallman* case, the Supreme Court said: "Unless the soil of the land used as a cemetery and that of the contiguous owners is such as to cause a drainage which will produce a contamination of the waters, thereby putting in jeopardy the health or the lives of the owners of the contiguous lands and the health of their families, or unless the air would be contaminated, courts of equity will not interfere by the grant of injunctive relief to prevent the establishment and location of the cemetery." There is nothing in the instant record to show that the health or lives of any of the citizens, or of their families or stock, are at the present time in danger from the cemetery in question, and the evidence as to possible seepage and drainage and as to what, in certain contingencies, may occur as a result thereof could hardly be said to show that the cemetery would probably become a nuisance in the future; but whether this is true or not, the provisions of section 5329 et seq. of the Civil Code (1910), having reference to the abatement of nuisances by freeholders in a

trial before justices of the peace, were not intended to afford a remedy against that which is not an actually existing nuisance, as distinguished from that which may or probably will become such. The language of section 5329 seems to admit of no other construction. See, in this connection, *Blackman Health Resort* v. *Atlanta*, supra; Sutton *v.* Findlay Cemetery Asso., 270 Ill. 11 (110 N. E. 315, L. R. A. 1916B, 1135; Village of Villa Park *v.* Wanderer's Rest Cemetery Co., supra. Injunction might issue even when there is no case for abatement, the latter remedy requiring proof of a present nuisance whereas the former might be available on reasonable probability that a nuisance will come into existence unless prohibited.

4. The only other facts shown and relied on by the complainants for the purpose of establishing the contention that the cemetery had become a nuisance were in relation to burial permits. The first three burials which occurred on December 10, 1925, were of bodies disinterred from another cemetery in Fulton county, known as Casey cemetery. Lincoln Memorial Park was, of course, situated outside the incorporated limits of any town or city because the act of 1910 has reference only to cemeteries so situated. Casey cemetery was also situated outside any incorporated town or city. Whether they were both located in the same militia district does not appear. Besides the three disinterred, seven other bodies were buried in the cemetery involved in this case prior to the commencement of the suit for abatement. According to the evidence, permits were obtained for all ten of these burials from an official referred to as "L. Thornton, local registrar, Atlanta, Georgia." The complainants offered evidence to show the appointment by the State Board of Health of "T. E. Lockhart, as health officer outside the city of Atlanta for all the districts of Fulton county." It is contended by counsel for complainants that, since the cemetery was situated outside the limits of the city of Atlanta, the burial permits should have been issued by the last named health officer, and that the burial of the bodies without permits issued by him rendered the cemetery a nuisance. The vital statistics act, approved August 7, 1914 (Ga. L., 1914, p. 157, Park's Code, §§ 1676m-1676mm) is cited in support of this contention. A careful reading of that act shows that the proper person to issue a burial permit is the registrar of the city or militia district, as the

case may be, in which the person died or the body was found. So far as appears, the deaths of all the persons buried in Lincoln Memorial Park occurred in the city of Atlanta. Nothing was shown to the contrary. It therefore can not be said that the permits were not issued by the proper official. There are some statutes having reference to the disinterring of bodies from cemeteries. See Park's Penal Code, §§ 408-410; Ga. L., 1916, p. 77, sec. 1, rules 1 and 4. But we have found no law making it penal for bodies to be disinterred from a cemetery under such circumstances as were shown in this case, in which the disinterments appeared to have been done by and with the consent of relatives entitled to control the burial and disposition of the bodies. We have been unable to find any law requiring permits for such disinterments. We can not say that permits therefor should have been obtained either from the health officer of Fulton county or from the local registrar of the city of Atlanta, although it appears in the evidence that the last named officer issued permits for the disinterring and removal of the bodies from Casey cemetery. The vital statistics law, referred to above, was not intended to cover such a case. This is clearly apparent when we reflect upon the purposes of that statute.

The permit granted to establish Lincoln Memorial Park as a cemetery was upon the condition, among others, that "All burials shall be made in a sanitary manner and according to rules and regulations of the Health Department of the county of Fulton and State of Georgia." We suppose the health regulations here referred to are those which may be promulgated under the Ellis health law (Ga. L., 1914, 124, Park's Code, § 1669a et seq.). No evidence was introduced to show what regulations had been adopted by the Fulton county board of health, nor therefore that any such regulations had been violated. The vital-statistics act is not a regulation by the board of health of Fulton county, even if it could be considered at all as a health measure. But see *Smith* v. *State,* 160 *Ga.* 857 (129 S. E. 542).

Moreover, unless an irregularity in the matter of obtaining disinterment or burial permits was a violation of one of the rules and regulations of the board of health of Fulton county, expressly subject to which the permit to establish this cemetery was granted, the failure to obtain proper permits would not, without more, render the cemetery a nuisance, even though such failure amounted

to a violation of the vital statistics act or some other act prescribing such permits but not declaring that the cemetery should become a nuisance in case proper burial permits were not obtained. There is no provision for such latter penalty in the vital statistics law. There was no basis for declaring the cemetery to be a nuisance in any of the evidence with respect to the obtaining or the failure to obtain burial permits. Nor was there any other evidence to support the verdict and judgment. The superior court erred in refusing the certiorari.

*Judgment reversed. Jenkins, P. J., and Stephens, J., concur.*

JENKINS, P. J., concurring specially. I concur in all that is said by my associates, except their reasoning as to the lack of all possible force and probative value of the evidence set forth and discussed in the third division of the opinion. While I agree that the evidence offered to show the existence of a present, continuing nuisance is somewhat vague and uncertain in character, I would be loath to hold that it fails, absolutely and as a matter of law, to support the finding, except for the fact that the jury had before them the record of the illegal revocation of the permit by the commissioners, which may have constituted the real basis of their finding.